Daniel **GREENE** and Sandra Greene as Legal Representatives of the Estate of Chad Greene, Petitioners,

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 88–41V.

United States Claims Court.

Dec. 14, 1989.

Kirk Watson, Austin, Tex., for petitioners.

Charles R. Gross, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, initially appeared on behalf of respondent but later withdrew from the proceedings.

ORDER

FUTEY, Judge.

This vaccine action is brought pursuant to the National Childhood Vaccine Injury Act of 1986 *as amended,* 42 U.S.C. § 300aa–10 *et seq.* (Supp. V 1987), which establishes a program for payment of compensation for injuries or deaths resulting from the administration of vaccines.

This matter comes before the court on Chief Special Master Gary Golkiewicz' Report and Recommendation of Judgment filed November 20, 1989.[1] No objection to the Special Master's Report and Recommendation of Judgment has been filed and the time to so file has expired.

---

1. The report filed on November 20, 1989, under footnote 1 provided that within 14 days of its filing, the parties shall designate any material subject to § 300aa–12 and not for deletion prior to public access. No designation was submitted. This Order contains no additional material. Accordingly, public access for this Order and Report shall now be afforded.

Pursuant to 42 U.S.C. § 300aa–12(d)(2), the Special Master's Report and Recommendation of Judgment is hereby adopted and the full report is attached hereto.

Accordingly, petitioners, as legal representatives of Chad Greene, are entitled to an award of $250,000.00 as statutory compensation and attorneys' fees and costs in the sum of $17,551.32.

The Clerk is directed to enter judgment in the sum of $267,551.32 for petitioners in their capacity as legal representatives for Chad Greene. No additional costs to be awarded.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION OF JUDGMENT[1]

GARY J. GOLKIEWICZ, Chief Special Master.

Petitioners seek compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–10 *et seq.* (Supp. V 1987) (hereinafter "the Vaccine Act"), for the death of their minor child, Chad Greene, allegedly resulting from a diphtheria-pertussis-tetanus (hereinafter "DPT") vaccine administration on April 14, 1980. An evidentiary hearing was held on September 19, 1989, in Austin, Texas.[2]

Pursuant to 42 U.S.C. § 300aa–12(c)(2) and Vaccine Rule 18(a), the undersigned recommends to the assigned Claims Court judge, Judge Futey, that judgment be entered for petitioners under the Vaccine Act in the amount of $267,551.32, consisting of $250,000 to compensate for Chad's death and $17,551.32 for attorney's fees and other costs.

I

## FINDINGS OF FACT

The following uncontroverted facts are fully supported by the record and, therefore, are so found:

Chad Greene was born to Daniel and Sandra Greene on February 24, 1980, at the Arlington Memorial Hospital in Arlington, Texas. *See* Petitioners' Exhibit No. 2, *Greene v. Secretary of Dep't of Health and Human Services*, No. 88–41V, at 13 (Cl.Ct. Sept. 25, 1989) (hereinafter "P Ex. — at —"). Labor and delivery were without incident. *Id.* at 12; *see also* P Ex. 3 at 5. Dr. R.W. Brentlinger was the delivering physician. P Ex. 2 at 12. At birth, Chad weighed 8 pounds–9½ ounces, and measured 22 inches in length. P Ex. 4 at 11. Apgar tests which numerically score the condition of a new born by assessing the newborn's heart rate, respiratory effort, muscle tone, reflex irritability and color, were conducted on Chad at one and five minutes after birth and resulted in scores of 8 and 9, respectively, out of a maximum score of 10. P Ex. 2 at 12; *see also* P Ex. 3 at 14. The hospital's "Pediatric Newborn Record" describes Chad as an "apparently normal male infant." P Ex. 4 at 3. Mother and child were discharged from the hospital on February 27, 1980, after an uneventful postpartum course. P Ex. 3 at 7.

On March 17, 1980, Chad, at the age of 3 weeks, was brought to Dr. Brentlinger's office at the Arlington Medical Clinic in Arlington, Texas, for Chad's first well-baby visit. P Ex. 5 at 1. At the time of examination, Chad weighed 10 pounds–4½ ounces and measured 22½ inches in length. The results of a phenylketonuria or PKU test were normal.[3] Dr. Brentlinger noted in his

---

1. This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (Supp. V 1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

2. Respondent filed an answer to the petition denying that petitioners were entitled to com-

pensation under the Vaccine Act. However, counsel for respondent withdrew on May 26, 1989, and no one appeared at the hearing on behalf of respondent. By order of June 21, 1989, respondent was notified of the date and place of the hearing. Notwithstanding, respondent did not participate in the hearing. Accordingly, respondent presented no evidence on any of the issues considered in this case.

3. A PKU test checks for the accumulation of phenylalanine which results in mental retardation and neurologic manifestations. *See Dor-*

record of that visit "no path[ology]", indicating that there was no evidence of any abnormalities. *Id.*

On April 14, 1980, Chad returned to Dr. Brentlinger's office for his second well-baby visit. *Id.* Again, the doctor's notes indicate that Chad was not suffering from any medical abnormality at the time of the visit. Dr. Brentlinger advised Mrs. Greene to begin feeding Chad egg yolk and vegetables and fruits. *Id.* On this visit, Chad received his first administration of a diphtheria-pertussis-tetanus vaccine and an oral polio vaccine. *Id.*

In the parking lot of the medical clinic following the checkup, Mrs. Greene gave Chad some Tylenol to prevent any fever that may result from the DPT vaccine. Hearing Transcript, *Greene v. Secretary of Dep't of Health and Human Services*, No. 88–41V, 37 (Cl.Ct. Sept. 25, 1989) (hereinafter "Tr. at ——"). The child slept the 15 to 20 minute ride home from the clinic. *Id.* at 38. At approximately 5:00 p.m., one hour after receipt of the vaccine, Chad started fussing and crying "hard". *Id.* at 38–39. All attempts to console the child were in vain. *Id.* As well, the thigh in which the shot was injected had swollen considerably. *Id.* at 39–41. The child would sleep for about two hours at a time, and when he awoke he was "cranky." *Id.* at 42.

At approximately 9:00 a.m. on April 15, 1980, Chad awoke and was fed a bottle. Mrs. Greene laid him cross-wise in his rectangular-shaped crib. *Id.* at 43. Mrs. Greene then returned to bed herself. She awoke suddenly at approximately 2:00 p.m. with the feeling that something was wrong as Chad had never slept that long. *Id.* at 44; *see also* P Ex. 9 at 2. She found Chad completely face down in the corner of his crib. His hands were clenched and extended to the side. His legs were also extend-

ed. His skin color was purple. *Id.* A plastic bag which was used to protect the mattress was found three to four inches from the child's head. *Id.* at 52; *see also* P Ex. 6 at 3; P Ex. 9 at 2. Mrs. Greene called an ambulance. P Ex. 6 at 2. Upon arrival, the medics found the child in full respiratory arrest. *Id.* at 3.[4] The child was transported to Arlington Community Hospital where attempts at resuscitation were unsuccessful. P Ex. 7 at 4. At 2:20 p.m., Chad was pronounced dead. *Id.*

In the autopsy report, Dr. N.S. Peerwani, the Chief Medical Examiner, concluded that the cause of death was "sudden infant death syndrome." P Ex. 8 at 5. In addition, it was noted that the child had not suffocated as originally suspected due to the proximity of the plastic bag, but rather died of natural causes. *See* P Ex. 9 at 3.

Mr. and Mrs. Greene filed a civil action against three vaccine manufacturers of DPT in 1986. *See Greene v. Wyeth Laboratories, Inc.*, Civil Action No. 4–86–624–E (N.D.Tex.1988). The Greenes subsequently moved to dismiss their case without prejudice so as to bring a petition under the Vaccine Act. *See* Order of Dismissal, *Greene v. Secretary of Dep't of Health and Human Services*, No. 88–41V (Cl.Ct. Nov. 20, 1989).

II

STATUTORY REQUIREMENTS

The Vaccine Act seeks to simplify the process by which to entitle and compensate those eligible individuals or the estates of those who have died as a result of a routine vaccine administration. In many cases under this compensation system, petitioners need not prove "causation." If the petitioner is able to demonstrate each of the following elements by a preponderance of the evidence [5], the court may then find that

---

*land's Illustrated Medical Dictionary* 1278 (28th ed. 1988).

4. The page in which the "Pt. Condition Report" of the Mid City Ambulance Service is found is paginated "6." However, numerically it is the third page, and therefore, shall be cited as page 3 of Petitioners' Exhibit No. 6.

5. The preponderance of evidence standard requires that the trier of fact "believe that the existence of a fact is more probable than its nonexistence before [the special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *In re Winship*, 397 U.S. 358, 370, 371, 90 S.Ct. 1068, 1075, 1076, 25 L.Ed.2d 368 (1970)

the petitioner is entitled to a rebuttable presumption of causation:

(1) The individual received a vaccine listed in the Vaccine Injury Table;[6]

(2) The vaccine was administered in the United States or in one of its trust territories;

(3) The individual sustained or had significantly aggravated an injury set forth in the Table in association with the named vaccine;[7]

(4) The individual suffered residual effects from such injury for a period of time greater than six months and incurred costs for more than $1,000 in unreimbursable expenses, or died as a result of the vaccine administration; and

(5) No award or settlement has been collected in a civil action for damages for such vaccine-related injury and death.

*See* § 300aa–11(c)(1); *see also,* § 13(a)(1)(A). The petitioner's presumption may be rebutted, however, if the respondent can demonstrate by a preponderance of the evidence that the injury or death was due to factors unrelated to the administration of the vaccine. § 300aa–(a)(1)(B). It should be noted that "unrelated" factors do not include "idiopathic, unexplained, unknown hypothetical, or undocumented

factor, illness, injury or condition...." § 300aa–13(a)(2)(A).

### III

### DISCUSSION

For the reasons set forth below, the undersigned finds that petitioners have demonstrated by a preponderance of the evidence that petitioners have satisfied all of the section 11(c)(1) elements and there is no evidence of an alternative cause of Chad's death. Therefore, petitioners are entitled to an award of compensation under the Vaccine Act.

**1. Administered a table vaccine in the United States.** Dr. Brentlinger's records from the Arlington Medical Clinic in Arlington, Texas, establish that Chad received a DPT vaccine in the United States, specifically, the state of Texas, thus fulfilling the requirements of parts (A) and (B) of § 300aa–11(c)(1). *See* P Ex. 5 at 1.

**2. Suffered a table injury.** The undersigned finds that petitioners have demonstrated by a preponderance of the evidence that Chad Greene suffered an anaphylactic shock.

#### a. *Anaphylactic Shock* [8]

█ In support of the argument that Chad in fact suffered an anaphylactic shock, petitioners presented the testimony of Dr. Mark Thoman[9], petitioners' medical

(Harland, J., concurring), *quoting* F. James, Civil Procedure 250–251 (1965). Mere conjecture or speculation will not establish a probability. *Snowbank Enter. v. United States,* 6 Cl.Ct. 476, 486 (1984).

6. The Vaccine Injury Table includes the following vaccines: DTP, DTP/Polio combination, or any other vaccine containing whole cell pertussis bacteria, extracted or partial cell bacteria, or specific pertussis antigen(s), measles, mumps, rubella, or any vaccine containing any of the foregoing as a component, DT, Td, or tetanus toxoid, live and inactivated polio vaccine. § 300aa–14(a).

7. Section 300aa–14(a)(I) sets forth the DTP-related table injuries: (1) anaphylaxis or anaphylactic shock, (2) encephalopathy or encephalitis, (3) shock-collapse or hypotonic-hyporesponsive collapse, (4) residual seizure disorder and (5) any acute complication or sequela (including death) of an injury referred to above. Petitioner must demonstrate that the child suffered one

of the injuries listed in the table prior to the child's death to successfully establish a table case as required by section 300aa–11(c)(1)(C)(i).

8. The Vaccine Act provides no interpretive aids of an anaphylactic shock or anaphylaxis as it does for the other table injuries, illnesses and conditions.

9. Dr. Thoman is board-certified physician in both pediatrics and toxicology. Dr. Thoman has spent a considerable amount of his professional career studying the toxicological effects of the pertussis vaccine. Tr. at 69–70, 71–72. He most recently participated as an expert on the toxicology of the pertussis vaccine in a working group organized by the Public Health Service, an arm of the Department of Health and Human Services, which was convened to develop a warning to parents of the contraindications of the pertussis vaccine and possible adverse reactions. Tr. at 67–68. Dr. Mark Thoman is known to this special master, having

expert witness. Dr. Thoman testified to a reasonable degree of medical probability that Chad suffered an anaphylactic shock within 24 hours of the administration of the DPT vaccine. Tr. at 118. Dr. Thoman based his opinion on the medical records and autopsy report of Chad Greene.

Dr. Thoman described for the court the process of anaphylactic shock and the varying reaction times among individuals. In some cases, a person will experience an anaphylactic reaction immediately upon introduction of the toxic substance into the person's system. In other cases, as in the present one, the reaction is a "slow, evolving process," which Dr. Thoman described as characteristic of the pertussis vaccine. Tr. at 112; *see also* Tr. at 115.

Dr. Thoman testified that the "dramatic" swelling of the child's entire thigh (and not just the site of the injection) is evidence of an ongoing anaphylactic reaction. Dr. Thoman explained that the local reaction observed is the result of histamine being released into the tissues surrounding the injection site. Tr. at 115. The histamine causes the blood vessels in the surrounding tissue to leak. The manifestation of this leakage is the swelling of the thigh. Tr. at 77. The adverse reaction to the histamine is then enhanced by the histamine sensitizing factor (hereinafter "HSF") of the pertussis toxin. Tr. at 115. The HSF increases the sensitivity of the individual to the toxin. Dr. Thoman explained further:

> In animal studies there have been violent reactions to pertussis vaccine given to animals and then [given] histamine, which in some cases can cause the animal to be sacrificed just because of the tremendous sensitivity that is in part of the vaccine.

Tr. at 77.

Furthermore, Dr. Thoman testified that the presence of a vast amount of petechial hemorrhages [10] was symptomatic of an anaphylactic process at work. "You will see

some [petechial hemorrhages] just with hypoxia, but with the clinical condition of the baby at death and ... the numerous petechial areas, more than you will see with just hypoxia. I think anaphylaxis is the process there." Tr. at 113. Based on the persuasive and uncontroverted testimony of Dr. Thoman, the court finds by a preponderance of the evidence that Chad suffered an anaphylactic shock within 24 hours after the administration of the DPT vaccine.

### b. *Encephalopathy*

Petitioners also advanced the theory that Chad probably suffered an encephalopathy before his death. However, petitioners need demonstrate only one of the injuries set forth in the table in order to satisfy subsection (C)(i) of section 11(c)(1). Therefore, having concluded that petitioners demonstrated by a preponderance of the evidence that Chad suffered an anaphylaxis or anaphylactic shock and having further found that the evidence presented in support of the occurrence of an encephalopathy was unsubstantial and speculative, this special master finds it appropriate to simply set aside as moot the petitioners' contention concerning a potential encephalopathy.

3. **Alternative cause of death.** To find that petitioners are entitled to compensation under the Act, the special master must find "that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition." § 300aa–13(a)(1)(B). Respondent did not participate in the hearing, and therefore, did not present evidence on this issue. However, Dr. Thoman, upon review of the child's medical history and records, could not attribute Chad's conditions and subsequent death to anything, but the pertussis vaccine. Tr. at 109.

---

testified as an expert at other such hearings under the Vaccine Act. As such, Dr. Thoman is qualified to testify as an expert on medical issues involving vaccines.

10. Petechia is defined as "a pinpoint, nonraised, perfectly round, purplish red spot caused by intradermal or submucous hemorrhage." *Dorland's Illustrated Medical Dictionary* 1268 (28th ed. 1988).

After a close examination of the record, it is found that there is not a preponderance of the evidence that Chad's death was due to factors unrelated to the administration of the DPT vaccine. Two items appearing in the record, however, merit brief discussion.

First, it was initially suspected that Chad died of asphyxiation because of the close proximity of a plastic bag to the child's head. *See* P Ex. 9 at 2; P Ex. 8 at 2. However, this theory was subsequently discounted by the chief medical examiner who ultimately concluded that the child died of natural causes. *See* P Ex. 8 at 5–6. Furthermore, Mrs. Greene testified that when she found Chad in his crib, the plastic bag was three to four inches from the child's head, contrary to police reports. Tr. at 53. Finally, Dr. Thoman confirmed such findings, testifying that there was no evidence of asphyxiation in the autopsy report. Tr. at 102. Based on the evidence in the record, it is clear that the plastic bag played no role in Chad's death.

Second, the autopsy report concluded that the cause of the child's death was Sudden Infant Death Syndrome (hereinafter "SIDS").[11] Dr. Thoman defined SIDS as a classification of a death for which there is no attributable cause, but rather the death was "sudden and unexplained and unexpected." Tr. at 72–73. The Vaccine Act specifically provides:

(2) For purposes of paragraph (1), the term "factors unrelated to the administration of the vaccine"—

(A) does not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition....

§ 300aa–13(a)(2)(A). As such, a "diagnosis" of SIDS cannot be considered an alternative cause of injury. The only significance to this case of the classification of SIDS is that the cause remains unknown and, therefore, anaphylaxis must be considered as an explanation for the child's death.

**4. Never collected an award or settlement for the death of Chad Greene.** Mrs. Greene testified that neither she nor her ex-husband, Daniel Greene, has ever received compensation in the form of an award or settlement for the death of their son. Tr. at 59. In addition, petitioners filed the court order dismissing the civil action without prejudice on October 20, 1988. *See* Order of Dismissal, *Greene v. Secretary of Dep't of Health and Human Services,* No. 88–41V (Cl.Ct. Nov. 20, 1989).

### IV

### COMPENSATION

Having found that petitioners have proven by a preponderance of the evidence the elements of § 300aa–11(c) and there is not a preponderance of evidence of an alternative cause of the death, petitioners are entitled to compensation. The Vaccine Act clearly provides compensation in the amount of $250,000 to the estate of a person who has died as the result of a vaccine administered after the effective date of the Act. § 300aa–15(a)(2).

### V

### ATTORNEYS' FEES AND COSTS

The Vaccine Act provides that a judgment on a petition awarding compensation under the Act shall include an amount to cover reasonable attorneys' fees and other costs. § 300aa–15(e). In support of petitioners' request for attorneys' fees and costs, petitioners have filed a fee petition

---

11. Differences of opinion exist in the medical community as to whether there is a causal connection between SIDS and the DPT vaccine. As such, whether such causal connection in fact exists is a matter for the scientific community, and not the court. In creating the National Vaccine Injury Compensation Program, Congress intended to provide compensation to eligible petitioners without the difficulties of proving a causal connection between the vaccine and the subsequent injury and/or death. The petitioners, therefore, need not demonstrate a causal relationship between DPT and SIDS. Thus, where a petitioner can demonstrate, *inter alia,* the receipt of a table vaccine and the sustaining of a table injury, the petitioner is presumed entitled to compensation. The issue of whether there exists a causal relationship between DPT and SIDS is not relevant to this decision.

entitled "Statement of Time Expenditure," (hereinafter "fee petition") which sets forth an itemization of the hours expended [12], the date and a brief description of each service performed and the initials of the individual who performed such service. P Ex. 10. Petitioners also filed an expense sheet for costs expended in the case. P Ex. 11. In addition, petitioners filed an addendum to the fee petition by request of the chief special master, which identifies the initials used in the fee petition and his or her respective position. *See* Identification of Initials Appearing on Time Expenditure Outline, *Greene v. Secretary of Dep't of Health and Human Services*, No. 88–41V (Cl.Ct. Nov. 20, 1989).

### 1. Method of Computation of "Reasonable Attorneys' Fees"

#### a. Petitioners' Arguments

In testimony and in a post-hearing brief, petitioners advance two methods of computation of "reasonable attorneys' fees". The first method is based on a contingent fee of 40 percent (or $100,000). Petitioners' attorney, Kirk Watson, testified that such a contingent fee was reasonable in the present case because of the considerable amount of work involved in the prior civil action. Tr. at 124–25.

In the alternative, Mr. Watson testified that a reasonable hourly rate for an attorney of his experience, expertise, and reputation in the Austin, Texas community was in the range of $300 to $500. Tr. at 127. In support of the requested hourly rate, petitioners presented the testimony of Daniel Bishop.[13] Mr. Bishop first testified that a contingent fee of 33 to 40 percent was a reasonable percentage. Next, he testified that an hourly rate of $300 to $400 was a reasonable rate based on his own experience in the area of personal injury. Tr. at

134–35. When questioned by the special master on the basis for his testimony, Mr. Bishop conceded that the $300 to $400 range was derived by equating the fees awarded on a contingent fee basis to an hourly rate figure. Tr. at 135. Upon further questioning by the special master as to reasonable hourly rates in the specific community, Mr. Bishop testified that hourly rates of $150 to $250 were standard in the personal injury litigation practice for a defendant's attorney in the community of Austin, Texas. Tr. at 138.

#### b. Discussion

■ Consistent with the vast body of case law interpreting the phrase "reasonable attorneys' fees" under a variety of federal fee-shifting statutes, the appropriate method for computing reasonable attorneys' fees is the "lodestar" method, subject to appropriate adjustments. *See* chief special master's Opinion and Order, *Gregson v. Secretary of the Dep't of Health and Human Services*, No. 88–1V, Slip Op. at 7 (Cl.Ct. April 24, 1989). The lodestar methodology has been upheld by this court as the appropriate methodology in the calculation of "reasonable attorneys' fees. *See, e.g.*, Order for Entry of Judgment of Robinson, J., *Lolley v. Sec'y of the Dep't of Health and Human Services*, 18 Cl.Ct. 498 (1989) (adopting the reports of the chief special master).

The lodestar is the product of the reasonable hours expended multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

---

**12.** The fee petition lists the hours expended by each individual involved in this case.

| Attorneys | Lanis W. Temple, Jr. | 2.3 hours |
| | Kirk Watson | 72.5 hours |
| Law Clerk | | 31.4 hours |
| Paralegal | | 10.9 hours |
| TOTAL | | 117.1 hours |

*See* Fee Petition at 19.

**13.** Daniel W. Bishop, II, is a partner in the law firm of Scott, Douglass & Luton in Austin, Texas. Mr. Bishop has practiced law in Texas since May, 1982. He is the president of the Austin Young Lawyers Association and is a member of the executive board of the Travis County Bar Association. Mr. Bishop has represented both plaintiffs and defendants in product liability cases involving personal injury. Tr. at 133–34.

The reasonable hourly rate represents "the prevailing market rates in the relevant community" for similar services performed by lawyers of comparable skill, experience, and reputation. *Blum,* 465 U.S. at 895, 104 S.Ct. at 1547 (1984).

The fee applicant carries the burden of proof. The applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. Where the supporting documentation is inadequate, the court may reduce the award accordingly. *Martin v. United States,* 12 Cl.Ct. 223, 227 (1987) (citing *Hensley v. Eckerhart,* 461 U.S. at 429, 433, 441, 103 S.Ct. at 1937, 1939, 1943.) To demonstrate "reasonable hours" worked, the applicant should provide contemporaneous time records and a personal affidavit in support of the fee petition.

Determining an appropriate market rate is a difficult task. *Blum v. Stenson,* 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. A fee applicant must produce evidence which demonstrates that the applicant's requested fee rate is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 896 n. 11, 104 S.Ct. at 1547 n. 11. "[G]eneralized and conclusory 'information and belief' affidavits from friendly attorneys presenting a wide range of hourly rates will not suffice." *Nat. Ass'n of Concerned Vets. v. Sec. of Defense,* 675 F.2d 1319, 1325 (D.C. Cir.1982). Against the above stated guidelines, the court reviews the petitioners' application for attorneys' fees and other costs.

2. Calculation of the Lodestar Figure

a. *Reasonable Hourly Rate*

Petitioners' request for a contingent fee of 40 percent or, in the alternative, an hourly rate of $300 to $500, which reflects the contingent fee translated into an hourly rate, must be rejected. The Supreme Court recently addressed the affect of pre-existing contingency agreements on fee-shifting statutes in *Blanchard v. Bergeron,* — U.S. ——, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). The Court held that the

presence of a pre-existing fee arrangement may aid in determining the reasonableness of an award. However, the contingency agreement standing alone, is not dispositive in the calculation of a fee award. *Id.* 109 S.Ct. at 944. The Court reaffirmed its view that the objective "lodestar approach [is] the centerpiece of attorney's fees awards." *Id.* at 945.

■ While courts may adjust the lodestar calculation using the 12 factors set forth in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5 Cir.1974), including the existence of a contingency fee agreement, no one factor is a substitute for the initial lodestar calculation. *Blanchard* 109 S.Ct. at 945. In the context of the Vaccine Act, there is no basis for adjusting the lodestar to account for any contingency factor.

If petitioners' counsel's compensation were contingent upon success, it may be appropriate to adjust the attorneys' fees award upward to compensate for the risk of not being awarded any fees. Under the Act, however, there exists little or no risk of such an occurrence. The Vaccine Act mandates the award of attorneys' fees in successful cases. § 300aa–15(e)(1). In addition, the Act gives the court discretionary power to award fees where an award of compensation is not made. *Id.* The court need only find that:

> The civil action was brought in good faith and there was a reasonable basis for the claim for which the civil action was brought.

*Id.* Therefore, there was little risk of nonpayment because counsel was virtually assured of a statutory award of fees, win or lose. What little risk that did exist should have been eliminated with counsel's initial investigation and counsel's decision to prosecute this case. Accordingly, no adjustment for the "contingency fee" is to be made.

Mr. Bishop testified that the range of hourly rates in the community is $150 to $250. Although not specifically stated, it is reasonable to assume that Mr. Watson is arguing for the high end of that range.

Mr. Watson has been licensed to practice law in the state of Texas since 1981, and has only been board-certified in personal injury trial law and civil trial law since 1986. Based on the evidence in the record, the court is not convinced that the combination of Mr. Watson's relatively young career and the straightforward nature of the litigation under the Vaccine Act could command the highest rates charged by lawyers in Mr. Watson's community.

The difficulty in determining an appropriate hourly rate under a fee-shifting statute was recognized by the Supreme Court in *Blum.*

> We recognize, of course, that determining an appropriate 'market rate' for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community. The type of services rendered by lawyers, as well as their experience, skill, and reputation, varies extensively—even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely. The fees charged often are based on the product of hours devoted to the representation multiplied by the lawyer's customary rate. But the fee usually is discussed with the client, may be negotiated, and it is the client who pays whether he wins or loses.

*Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11.

Similar to the situation in *Blum,* wherein the Court was reviewing an award of attorneys' fees under the Civil Rights Attorney's Fees Act of 1976, the determination of the "market rate" under the Vaccine Act is without the benefit of negotiation or even discussion between attorney and client. The reasonable fee is determined by the court and paid as part of the judgment. *See* § 300aa–15(e). This award is exclusive; no additional fees may be levied by the attorney. § 300aa–15(e)(3). The absence of market conditions in such a determination is particularly telling in situations such as the instant case where there is no history of "rates charged in private representations [which] may afford relevant comparisons." *Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11. Because of the lack of market forces in setting the hourly rate, the burden of establishing the reasonableness of the claimed hourly rate is placed on the moving party. *Id.* The court finds that petitioners have failed to meet this burden.

Despite Mr. Watson's efforts, what has not been established is the comparability between the level of difficulty in litigating a case under the Vaccine Act, and therefore the level of ability necessary to handle a case filed under the Act, and the types of cases and issues attorneys in Austin, Texas, command the highest hourly rates. In essence petitioners failed to show that Mr. Watson was providing "similar services" as those attorneys receiving $250 per hour. *See Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11; *see also Copeland v. Marshall,* 641 F.2d 880, 892 (D.C.Cir.1980) (en banc). Accordingly, the court finds that, in this case, petitioners have failed to establish that the claimed rate is consonant with the fees charged in the relevant community for services of similar complexity and difficulty.

In setting an appropriate hourly rate for Mr. Watson, the court considers the following factors: the community rates of $150 to $250 per hour, Mr. Watson's experience and years of practice, and Mr. Watson's performance in this case. Balancing these factors with the reduced burden of proof under the Vaccine Act, the special master finds $175 per hour to be a reasonable rate for Mr. Watson in this case.

In the fee petition, petitioners also requested an hourly rate of $50 for law clerks and $30 for legal assistants. Although no documentation was provided to support these rates, it is this special master's experience that these rates are reasonable and thus allowable.

b. *Reasonable Time Expenditure.*

(i) *Contemporaneous time records*

Petitioners' counsel has submitted a summary of hours expended in this petition and

the prior civil action.[14] The summary sets forth the dates and the character of the service performed, the number of hours expended for each service provided and the initials of the attorney, paralegal or law clerk providing the service.[15] *See* P Ex. 10.

It is evident from the testimony of Kirk Watson, petitioners' attorney, and the fee petition itself that petitioners' attorney has reconstructed the time expenditures from the case file in both the prior civil action and the present petition. *See* Tr. at 125–27. As the prior civil action was taken on a contingent fee basis, it is understandable that petitioners' attorneys did not maintain contemporaneous time records, and therefore, a careful reconstruction is adequate.

Attorneys' fees are clearly available under the Vaccine Act. *See* § 300aa–15(e). As such, contemporaneous time records must be kept for time spent on any proceeding under the Vaccine Act. Counsel was fully aware of the attorneys' fee provisions of the Vaccine Act. In fact, petitioners' attorney and paralegal apparently did extensive research on attorneys' fees under the Vaccine Act in March, 1989. Fee Petition at 15.

■ Courts have disallowed or drastically reduced a fee award for failure to maintain contemporaneous time records. *See Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984). Other courts have outright rejected "after-the-fact estimates of time expended." *See Nat. Ass'n of Concerned Vets. v. Sec. of Defense,* 675 F.2d 1319, 1327 (D.C.Cir.1982). The court in *Nat. Ass'n of Concerned Vets* wrote in pertinent part:

Attorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney. As stated by the Court of Appeals for the Second Circuit, "any attorney who hopes to obtain an allowance from the court should keep accurate and current records of work done and time spent." *In re Hudson & Manhattan R.R. Co.,* 339 F.2d 114, 115 (2d Cir.1964); *accord, In re Wal–Feld Co.,* 345 F.2d 676, 677 (2d Cir. 1965).

*Id.* at 1327. Notwithstanding petitioners' failure to provide contemporaneous time records, an award of attorneys' fees will not be precluded in this case. Because of the relative newness of the Act, the court is tolerant in this case of what would otherwise amount to a defective submission. The reconstructed time records, though not exemplary, are adequate. Where reconstruction is inadequate, the court has accordingly reduced the award. Henceforth, reconstructed time records for hours expended under the act shall not be accepted.

(ii) *Reasonableness of hours expended*

Petitioners' counsel has submitted a summary of hours expended in this petition. The summary sets forth the dates and the character of the service performed, the number of hours expended for each service provided and the initials of the attorney, legal assistant, law clerk or legal secretary providing the service. *See* Fee Petition, *supra.*

In determining the reasonableness of time spent, the court in *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945 (1st Cir.1984),

14. In petitioners' fee petition, petitioners do not distinguish the time expended on the prior civil action from that expended on the present petition. Ultimately, such distinction will not be important because the fees incurred under the petition and the prior civil action are both awardable. *See,* page 22, *infra.* However, were it the case that the fees incurred under the prior civil action were not awardable, it would have been necessary to distinguish the time expenditures.

15. Petitioners submitted in their fee petition the hours expended on both the prior civil action

and the present petition without distinction. As determined by the court, they are as follows:

| Prior civil action | 37.2 attorney hours |
| | 0.1 law clerk hours |
| | 2.6 legal assistant hours |
| | 0.4 secretarial hours |
| | 0.3 miscellaneous hours |
| Total | 40.6 hours |
| Vaccine Act petition | 38.4 attorney hours |
| | 30.1 law clerk hours |
| | 6.5 legal assistant hours |
| Total | 75.0 hours |
| Total Hours Claimed | 115.6 hours |

"look[ed] to the documents submitted to the courts and to the hours claimed to determine whether a reasonable number of hours was spent, given the nature of the task at hand and the results achieved." *Id.* at 952. Those hours which reflect "excessive, redundant or unnecessary" hours shall be excluded. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1982). In requesting statutory attorneys fees, an attorney must use the same "billing judgment" as he would use in billing a client. "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Id.* at 434, 103 S.Ct. at 1939. The focus of attention then will be on those hours which appear, at first glance, to have been excessive, redundant or unnecessary. The remainder of the hours requested have been carefully scrutinized, and having found that the hours were reasonably spent, no further discussion is warranted.

First, petitioners claim a total of 0.40 hours for the services provided by Peggie R. Jones and Melanie Patrick, legal secretaries at counsel's law firm. *See* Fee Petition at 1 and 9. This expenditure of time is disallowed. The hourly billing rate of an attorney includes his or her overhead expenses. *See Bennett v. Dep't of Navy,* 699 F.2d 1140 (Fed.Cir.1983). Secretarial services is one such overhead expense, and, therefore, is not compensable separately. *Id.; see also Henry v. Webermeier,* 738 F.2d 188, 192 (7th Cir.1984).

Second, petitioners claim a total of 0.3 hours for the "remailing of notice letter to Defendants" and "interoffice memo re: Defendant's Lederle and Wyeth received notice letter 2/19/86." *See* Fee Petition at 2. The fee petition does not indicate who performed such services. Without this information, the court cannot accurately calculate the cost of such services. Accordingly, this time expenditure is not allowed.

Third, petitioners have claimed a total of four (4) hours of attorney time for the drafting and preparation of interrogatories to the defendants in the prior civil action, Wyeth Laboratories and Lederle Laboratories. *See* Fee Petition at 10. There are two entries for each defendant on the same date which leads this special master to believe that the second entry for each defendant was mistakenly duplicated. Therefore, this hourly amount shall be reduced to two (2) attorney hours.

Fourth, the three entries dated January 13, 1989, claim a total of 0.6 attorney hours and 0.4 law clerk hours for requesting legible copies of hospital records from the various sources. Fee Petition at 13–14. This activity does not require the expertise of an attorney. Thus, it should not be compensated for at an attorney's billing rate. Furthermore, this expenditure of time represents a duplication of work by the law clerk and attorney. Accordingly, 0.6 law clerk hours shall be allowed for these entries.

Fifth, entries totalling 0.8 law clerk hours are disallowed. Fee Petition at 15 and 17. Information regarding the date is incomplete in the entries marked "03/—/89" and "5/—/89." Reconstruction of these particular entries is inadequate and, therefore, non-compensable.

Sixth, two entries dated April 4, 1989, for the research and preparation of a motion to suspend under Claims Court General Order No. 24, total 0.8 attorney hours and 1.2 law clerk hours, Fee Petition at 16, is excessive given the straightforward nature of General Order No. 24. Accordingly, 0.5 attorney hours and 0.5 law clerk hours shall be allowed for such activity.

Finally, the entry dated August 1, 1989, for a "[l]etter to Mrs. Greene with HHS report re: case deemed non-compensable," totals 0.1 attorney hours is also disallowed. *See* Fee Petition at 17. There appears to be a duplication of entries as a similar letter (including the HHS report) was mailed to Mrs. Greene on April 10, 1989. *Id.* at 16. Even if the later entry represents a second letter sent because the first was never received, this would also not be compensable as the activity is of a secretarial nature.

Accordingly, the time expenditures for attorney hours are reduced by a total of three (3) hours, law clerk hours are reduced by a total of 1.3 hours, and miscellaneous

time expenditures are reduced by a total of 0.7 hours. Therefore, the time expenditures found reasonable are as follows:

| | | |
|---|---|---|
| Attorneys | 72.6 hours at $175/hour | = $12,705.00 |
| Law Clerks | 28.9 hours at $ 50/hour | = $1,445.00 |
| Legal Assistants | 9.1 hours at $ 30/hour | = $273.00 |
| TOTAL | | $14,423.00 |

This special master finds that $14,423.00 is a reasonable amount to be awarded for attorneys' fees in this case.

### 3. *Reasonable Costs*

In a careful review of petitioners' submission on expenses incurred in this proceeding and the prior civil action, most of the expenses listed are reasonable, and therefore, compensable. However, certain other costs are unnecessary or unexplainable, and for that reason will be the focus of the following discussion.

First, petitioners claim $125.00 for membership dues in the DPT Litigation section of presumably the American Trial Lawyers Association. Petitioners have provided no basis for charging this expense to this case. Accordingly, this expense is disallowed.

Second, petitioners claim $600 for the professional services of Dr. Robert Cain who presumably reviewed the medical records of Chad Greene. There is no indication in the record of Dr. Cain's participation in the present proceeding or the prior one. Furthermore, petitioners have provided no explanation in their fee petition as to Dr. Cain's involvement. Therefore, this expense is disallowed.

Third, under the heading of "General Expenses", petitioners list "Nightrider" and "Ginny's" in an amount of $163.79 and $13.00, respectively. Petitioners have offered no explanation as to what these services provide. As such, these expenses are not allowed.

Fourth, the entry for "Postage, Federal Express" claims an amount $55.477 (sic). Because of the extra decimal point in this amount, it appears that the submitted amount may be the result of a typographical error. However, it is not the role of the court to proofread petitioners' filings for errors. Therefore, an amount of $55.47 is reasonable and shall be awarded for the costs of postage and express mail.

Finally, petitioners request a total of $178.85 for travel, car rental and plane fare. Petitioners provide no explanation as to what proceeding this may have involved, if any. It is questionable whether the travel expenses were incurred under the present petition as the hearing was held in Austin, Texas, where petitioners' attorney is located. Furthermore, there is no indication in the fee petition, which includes an accounting of time for the prior civil action, that there was any travel time relating to the prior civil action. Therefore, these expenses are disallowed.

Therefore, the total costs awardable to petitioners under section 300aa–15(e) are $3,128.32.

## VI

### CONCLUSION

In view of the foregoing, it is recommended that judgment be entered for petitioners in the amount of $267,551.32, consisting of $250,000 to compensate petitioners for the death of petitioners' son, Chad Greene, and $17,551.32 for attorneys' fees and other costs.[16]

---

16. It is recommended that the judgment provide for payment of attorneys' fees and costs in full as part of the first installment payment.