John DOE & Mary Doe, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

United States Claims Court.

Jan. 31, 1990.

Paul S. Dannenberg, Williston, Vt., for petitioners.

John Lodge Euler, U.S. Dept. of Justice and Gemma Flamberg, Dept. of Health and Human Services, Washington, D.C., for respondent.

## ORDER

HORN, Judge.

This is an action for compensation for a vaccine-related injury to petitioners' child, brought by his parents John Doe and Mary Doe, under the National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660, 100 Stat. 3758, *as amended by* several public laws codified in 42 U.S.C.A. § 300aa–1 to –34 (West Supp.1989).[1] This matter comes before the court pursuant to the Report and Recommendation submitted in the above-captioned case by Special Master Elizabeth E. Wright, on October 26, 1989.[2]

This case was filed by the petitioners on February 14, 1989. Initially, the respondent, The Department of Health and Human Services, was represented by Mr. Charles Gross of the United States Department of Justice. After what this court views as an ill advised and disrespectful decision by the Department of Justice to withhold representation in vaccine cases, Mr. Gross withdrew from the case on May 26, 1989. No new attorney entered an appearance on behalf of respondent until November 28, 1989, just before the Department of Justice filed its "Response to Petitioner's [sic] Objection to the Special Master's Report and Recommendation," on December 12, 1989. Petitioner had previously filed its Motion to Object to the Report of the Special Master on November 13, 1989.

Although it is always a serious undertaking to reject a petitioners' claim for relief in a tragic case such as this, after a review of the record in this case and of the Report and Recommendation prepared by Special Master Elizabeth E. Wright, this court finds itself in agreement with the Report and Recommendation, as written. Of particular note is the absence before this court of contemporaneous documentation of the date of the injury which would indicate that the injury occurred within the statutory framework, the absence of clear medical

1. The court is cognizant of the fact that the National Childhood Vaccine Injury Act was added to and amended by the Omnibus Reconciliation Act of 1989, Pub.L. 101–239, 103 Stat. 2106. Since the aforementioned amendment was not in effect, however, when this case was filed with the court, 42 U.S.C.A. § 300aa–1 to –34 (West Supp.1989) remains the controlling law in the case at bar.

2. The records in this case have been sealed pursuant to the petitioners' request and pursuant to this court's Order, dated December 20, 1989. Consequently, public access to the records in this case will be unavailable. The opinion of the court, which incorporates the Opinion of the Special Master, will be available only under the title John Doe and Mary Doe, petitioner v. Secretary of the Department of Health and Human Services. The child's name and the docket number will also not appear in the Opinion when it is released to the public.

opinion to substantiate petitioners' claim that the child's condition was caused by the Measles, Mumps and Rubella (MMR) Vaccine administered on March 9, 1979, and the less than a clear recollection of the child's father, mother and grandmother to document the injury as having occurred within the statutory time period after the vaccine was administered. The testimony of Dr. Mary D. Scollins, who indicated only that it was "highly possible" that the MMR vaccine caused the child's encephalopathy, while testifying that the symptoms began about 6 weeks following the immunization, does not support the necessary finding of causation.

The petitioners have failed to prove, by a preponderance of the evidence, as required in the statute, 42 U.S.C.A. § 300aa–13(a)(1)(A) (West Supp.1989), that they are entitled either to a presumption that the administration of the MMR vaccine on March 9, 1979, caused the injury or that the administration of the vaccine actually caused the child's medical condition. After reviewing the record in this case, many doubts remain in this court's mind concerning causation, as well as the actual date of the onset of the child's unfortunate condition.

The court further rejects petitioners' request, included in their "Motion to Object to the Report of the Special Master," for a de novo review on the issue of causation. Although 42 U.S.C.A. § 300aa–12(d)(1) (West Supp.1989) provides an opportunity to request such de novo review, there is no absolute right to such a remedy. The decision of whether or not to grant de novo review in any case is discretionary with the court. In this court's opinion, it is not enough to have tried and failed to warrant de novo review.

The court cannot find any fault with the manner in which Special Master Elizabeth E. Wright conducted the proceedings. In fact, it is this court's opinion that she provided a fair and complete opportunity to all parties to present their case for her review. Moreover, as indicated above, based on the evidence submitted in this case, including the petition, together with supporting documents, and the evidence presented at the hearing on August 30, 1989, this court agrees with the Special Master's conclusion to deny an award to petitioners. De novo review should not be available to a party to supplement a record, which a finder of fact has found inadequate, when all the parties have had ample opportunity to present their case.

This court also endorses Special Master Wright's conclusion that the petitioners are not entitled to a default judgment against the respondent. This court certainly does not condone the failure of the Department of Justice to meet its statutory and assigned responsibilities to represent the United States, its taxpayers and Executive Branch Agencies, such as the respondent, the Department of Health and Human Services. Nonetheless, under Vaccine Rule 55(c), no judgment by default shall be entered, against respondent unless the petitioner independently establishes a right to such relief to the satisfaction of the fact finder.

Although this court endorses Special Master Wright's finding that attorneys' fees should be awarded in this case, even though the petitioners did not prevail, it does so with some reservations. The record does not contain evidence of bad faith on the part of the attorney, rather it is an example of a longshot attempt to recover under the vaccine program, given that according to some of the doctors no other explanation for the child's symptoms could be identified. It is, of course, possible that, initially, the attorney could not accurately assess the strengths and weaknesses of the case, until substantial work had been completed. This is not a case of a battle between experts, rather it is a case in which petitioners have failed to offer sufficient evidence to carry the day. In all probability, based on the evidence which has been offered in support of petitioners' claim, that evidence, in fact, does not exist.

If this court, in a case such as this one, were to rule against the request of petitioners' attorney for fees, it is feared that precisely the wrong message could be received by the legal community. Federal

courts in general, and this judge in particular, should not condone, or in any way encourage, frivolous lawsuits. Nonetheless, potential petitioners who seek compensation under the vaccine program, including those with limited resources, should be able to obtain representation. Although the statute certainly allows for *pro se* representation, such litigation can lay a heavy burden on a petitioner even under the streamlined vaccine program, with its relaxed rules of evidence.

The burden of advising potential petitioners and their parents or guardians regarding the strengths or weaknesses of a potential lawsuit, resides with members of the bar who have taken an oath as officers of the court. Although unsuccessfully pursued, based on the record at issue, and absent direct evidence to the contrary, this court can support the recommendation of Special Master Wright that the action was brought in good faith and that an award of attorney's fees is appropriate.

The court also adopts the Special Master's use of the "Lodestar" method (reasonable hours expended $\times$ a reasonable hourly rate) of calculating reasonable attorney's fees for the purposes of award. The request for fees presented in this case is not exorbitant and, as adjusted by Special Master Wright's deductions of the items detailed on pages 25–26 of her report, should be allowed. Having lived with this case from its inception, she is clearly in the best position to make the subtle judgments regarding for which hours and tasks attorney's fees are appropriate. The affidavit of Susan M. Dole, Esq, Assistant Executive Director of the Vermont Bar Association, submitted together with the Motion for Attorney's Fees, appears to validate the

$90.00 per hour rate and meets the requirements for submission of proof included in Special Master Wright's Order issued on October 5, 1989. Accordingly, the court adopts the finding of Special Master Elizabeth E. Wright that the attorney in the above-captioned case should be awarded $14,353.30 in reasonable attorney's fees.

As discussed more fully above, after a review of the whole record in the case, the court adopts the conclusions included in the Report and Recommendation of Special Master Elizabeth E. Wright in accordance with 42 U.S.C.A. § 300aa–12(d)(2) (West Supp.1989). The court, hereby, incorporates Special Master Wright's Report and Recommendation into its Order, in full, and it will appear as part of this court's Order when issued.[3]

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION FOR JUDGMENT *

### October 26, 1989

ELIZABETH E. WRIGHT, Special Master.

This is an action for compensation for the vaccine-related injury of petitioners' child (hereafter "the child"), brought by his parents, John Doe and Mary Doe, under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. § 300aa–10 *et seq.* (Supp. V 1987) (hereafter the "Vaccine Act" or "the Act").[1] Petitioners allege that their son suffered an encephalopathy caused by the administration on March 9, 1979, of a mumps-measles-rubella vaccine (hereafter "MMR"), resulting in brain damage and subsequent retardation.

A hearing was held on petitioners' entitlement to compensation on August 30, 1989, in Burlington, Vermont.[2] At the

---

3. For the purposes of publication, this Opinion and the Report and Recommendation of Special Master Elizabeth Wright have been redacted to excise the docket number of the case, the petitioners' names and the name of the affected child.

* This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will

be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

1. Hereafter, all references to sections of the Vaccine Act will eliminate the reference to 42 U.S.C.

2. The issues in this case were bifurcated and the evidentiary hearing was limited to the question of causation. Since the special master found

hearing, petitioners presented five witnesses: Mary Doe, the child's mother; John Doe, the child's father; the child's grandmother; Dr. Elizabeth Clark, the child's pediatrician; and Dr. Mary Scollins, a developmental pediatrician.

The attorney of record representing respondent, Charles R. Gross, withdrew from this case on May 26, 1989.[3] No new attorney entered an appearance for the respondent following Mr. Gross' withdrawal. On July 25, 1989, petitioners filed a motion for default judgment against respondent. No response was filed. Although notified, respondent did not participate in the August 30, 1989, evidentiary hearing in this matter.

Pursuant to § 300aa–12(c), and United States Claims Court Vaccine Rule 18(a), and for the reasons stated below, the undersigned recommends that petitioners' application for compensation under the Vaccine Act be denied, and that attorney's fees be awarded in the amount of $14,353.30.

### ISSUES PRESENTED

In assessing whether petitioners may receive compensation under the Vaccine Act for the child's injuries, this court must first determine (1) whether petitioners are entitled to a default judgment. If no basis for default exists, the court must then inquire (2) whether the petitioners have demonstrated by a preponderance of the evidence that the child suffered an encephalopathy due to the administration of an MMR vaccine. Regardless of whether or not petitioners prevail on the merits, this court must decide (3) whether an award should be made of attorneys' fees and costs.

### I.

### HEARING RECORD

The child was born on July 25, 1977 at the Medical Center Hospital of Vermont. *See* Transcript of August 30, 1989, Hearing, *Doe v. Secretary of Health and Human Services,* (Cl.Ct.) (hereafter "Tr. at ___") at 7; Hearing Exhibit 1, *Doe v. Secretary of Health and Human Services,* (Cl. Ct.) (hereafter "Ex. ___"). The child was the product of a full term pregnancy, delivered by caesarean section. Tr. at 8; Ex. 1 at 73, 79, 80, 91. He weighed 7 lbs. 10 oz. at birth, and his APGAR scores[4] were 8 and 9, respectively. Ex. 1 at 80, 91.

Immediately after birth, the child suffered mild respiratory distress. Tr. at 8, 43–44, 53. He became slightly cyanotic and his rate of respiration was elevated. Tr. at 41, 43; Ex. 1 at 87. Both his PH and his oxygen saturation were somewhat low and he was administered oxygen. Tr. at 43, 46, Ex. 1 at 88. The child was diagnosed as suffering from slight transient tachypnea. Ex. 1 at 89. As explained by Dr. Clark, the child's pediatrician, such a condition is descriptive of a newborn with rapid breathing for a short period of time due to an accumulation of fluid in the lungs. Tr. at 39. X-rays later revealed dissipation of the fluid and the child was released from the hospital on July 30, 1977. Tr. at 50; Ex. 1 at 89, 99.

The child also was born with "a mild A–B–O [blood] incompatibility with jaundice which was treated with phototherapy and observation of the hematocrit until val-

---

that no entitlement to compensation exists, no hearing was held on the question of future unreimbursable medical expenses.

**3.** There is no provision in the Vaccine Rules for the withdrawal of counsel by respondent. Vaccine Rule 81(d)(4) does provide for a "change" in counsel whenever a case is reassigned to another attorney. However, given the plain mandate of the Vaccine Act that petitioners be accorded speedy rulings on their claims, the special master had no choice but to continue to process the action without undue delay and in whatever way was practicable, with or without the participation of the respondent. Further, it is clear pursuant to section 300aa–13(a)(1)(A) of

the Vaccine Act and Vaccine Rule 55(c) that even if the respondent does not participate, and therefore, is in technical default, the petitioner must still establish a claim for compensation under the Vaccine Act by evidence satisfactory to the court.

**4.** An APGAR test measures heart rate, respiration, muscle tone, responsiveness to stimulation, and skin color. Generally, two tests are performed at exactly one and five minutes after birth. A perfect score is ten. *The Merck Manual of Diagnosis and Therapy* at 986 (13th ed. 1977).

ues returned to normal at four months." Ex. 1 at 29.

Because of his early difficulties and blood incompatibility, Dr. Clark monitored the child's early developmental milestones "carefully." Tr. at 53–54.[5] At six weeks he smiled. Tr. at 55; Ex. 1 at 29. At three months he played with his hands; at four and a half months, he was able to roll over. Tr. at 55; Ex. 1 at 29. By ten months, he could crawl and pull himself to a stand, and at 14 months, he stood alone and used many words. Tr. at 55; Ex. 1 at 29, 73. By 17 months, he could walk alone and by 19½ months he was using short phrases.[6] Tr. at 56; Ex. 1 at 29, 73.

On February 14, 1978, Dr. Clark treated the child for an upper respiratory infection. Ex. 1 at 73. Other than his health problems at birth, the record reflects no other significant illnesses or injuries until sometime after the administration of his second MMR vaccine.

The child received three vaccinations of diphtheria-pertussis-tetanus ("DPT") without incident.[7] Tr. at 12–13. Oral polio vaccines were also administered at these times as well. On September 19, 1978, one week before his 14 month birthday, Dr. Clark gave the child an MMR vaccination. Tr. at 56; Ex. 1 at 29, 73. According to his mother, he had no reaction to that vaccination. Tr. at 13. On March 9, 1979, the child again was seen by Dr. Clark. Ex. 1 at 29, 73. Because the first MMR vaccine was given before he reached 15 months, Dr. Clark gave the child a repeat MMR on that date.[8] Ex. 1 at 29, 73. At that time, he was given another DPT vaccination and an oral polio booster as well. Ex. 1 at 29, 73. All of these vaccines were administered in the offices of Dr. Clark, in Burlington, Vermont. Ex. 1 at 29, 73.

According to the testimony of the child's mother, the child had a cold which began approximately three weeks before his second MMR vaccination. Tr. at 19, 21. That cold lasted approximately one week. Tr. at 19, 21. When the child was given his MMR vaccine on March 9, 1979, his mother recalls that he no longer had any cold symptoms[9] and there are no indications in Dr. Clark's medical records that the child showed any signs of illness. Tr. at 20–22; Ex. 1 at 73.[10] Within a day or two of the MMR vaccination on March 9, 1979, the child developed a high fever and fussiness. Tr. at 26, 28. The reaction only lasted approximately 24 hours and was relieved by the administration of baby Bayer's aspirin. Tr. at 29. Mrs. Doe testified that approximately one week after the second MMR vaccine, the child developed another cold which lasted for about one month until around April 15, 1979. Tr. at 15, 23; Ex. 1 at 31.

On May 7, 1979, approximately two months after the administration of the second MMR vaccine, Mrs. Doe brought the child to see Dr. Clark. Tr. at 26, 32, 63; Ex. 1 at 29, 73. The medical records reflect that the child was suffering from a two to three week history of stumbling, falling, hand tremors, and rapid eye movements. Ex. 1 at 30, 31, 33, 37, 49. As the child's mother testified, around April 15, 1979, was when she "first start[ed] to notice, and think maybe that it was new

5. Dr. Clark was concerned because people with Type O blood carry anti-A and anti-B substances in their blood serum. If these filter through the placenta to an A or B-type baby, they threaten to hemolyze the child. Tr. at 49.

6. Dr. Clark commented that with the exception of walking, which was somewhat late, all of the child's developmental milestones were within normal ranges. Tr. at 60; Ex. 1 at 29.

7. These were administered on 9/7/77, 10/26/77 and 12/7/77, 1½, 3, and 4½ months respectively. Ex. 1 at 29, 73.

8. Dr. Clark's records reflect that the child was only given the measles and mumps portion of

the vaccine. Ex. 1 at 73. However, according to Dr. Clark's oral testimony, she is certain rubella was administered as well since she carried no vaccines at that time without the rubella portion of the vaccine. Tr. at 59.

9. Mrs. Doe initially testified that the child had a cold on March 9, 1979. Tr. at 14. She later clarified that testimony.

10. Dr. Clark testified that if the child were obviously sick, or if he had a cold and possible ear infections, she would not likely have immunized him. Tr. at 57.

shoes, that he was a little unsteady in his gait, in his walk." Tr. at 24.[11] Mrs. Doe noticed other things as well: "... several mornings in a row he would drop something off his tray ... and when he would get it, it seemed like every morning he would get up and bump his head because he lost his balance." Tr. at 24. The weekend before May 7, 1979, the child had extreme difficulty walking, and his condition "boomeranged." Tr. at 26, 34.

According to Dr. Clark, at the time of the May 7 office visit, the child was falling a lot, had a very wide-based gait, very hyperactive reflexes, and a positive Babinski reflex.[12] Tr. at 65–66; Ex. 1 at 73. He experienced no vomiting.[13] Tr. at 66; Ex. 1 at 73. Dr. Clark recalled, "there was something going on at the time ... this was not something we were going to say, well, let's wait and see what happens." Tr. at 67. Dr. Clark immediately referred the child to a neurologist, Dr. Emery. Tr. at 32, 68–69.

Dr. Emery admitted the child to the Medical Center Hospital of Vermont on May 8, 1979, during a severe episode of ataxia.[14] Tr. at 75–76; Ex. 1 at 31. A CT scan taken at the hospital showed a midline lesion at the brain stem signifying a possible tumor. Tr. at 78; Ex. 1 at 33. The child was discharged on May 11, 1979, to go to Montreal Neurological Hospital for a more sophisticated CT scan. Ex. 1 at 32, 33.

The child's ataxia and related symptoms worsened between May and August, 1979. Ex. 1 at 30. By late June, he had lost most of his recently acquired vocabulary. Ex. 1 at 33. He was again hospitalized on July 16, 1979. Ex. 1 at 33. At that time, he could not even sit without swaying. Tr. at 67. "He would shriek, throw himself on

the ground, bang his head against the bedside." Ex. 1 at 40. The CT scan was repeated in Montreal; the results of both CT scans in Montreal were "equivocal." Ex. 1 at 33, 35, 39. In August 1979, a course of ACTH by injection was started. Ex. 1 at 30, 42, 49, 74. The child's condition seemed to stabilize and eventually improve, and his medication was changed to oral hydrocortisone in November of 1979. Ex. 1 at 30, 74. He remained on hydrocortisone until February, 1984, as each earlier attempt to wean him off the drug exacerbated his ataxia. Ex. 1 at 30, 76.

Although a number of hypotheses were posited throughout the child's treatment, each was eventually ruled out and no cause of the child's ataxia was ever discerned. Tr. at 77–79, 81; Ex. 1 at 35, 39, 49. Today, the child has a permanent and serious disability involving cognitive, behavioral, and motor development. Ex. 1 at 23. He is moderately mentally retarded. Ex. 1 at 25–26, 30.

## II.

### THE STATUTORY REQUIREMENTS

The Act requires the petitioners to establish the following elements by a preponderance of the evidence before compensation can be awarded, § 300aa–13(a)(1)(A):

(1) the child received a vaccine listed in the Vaccine Injury Table [hereafter "Table"]; § 300aa–11(c)(1)(A);

(2) the vaccine was administered in the United States; § 300aa–11(c)(1)(B)(i)(I);

(3) he sustained an injury listed on the Table within the specified time limits, § 300aa–11(c)(1)(C)(i), *or* he sustained an injury not set forth in the Table which in fact was caused by the vaccine,

---

**11.** The child's grandmother also recalls changes in her grandson but could not recall with any accuracy when those changes began. Tr. at 93–94. The child's father was the only witness who suggested he observed anything wrong with the child prior to April 15, 1979. According to his testimony, the child developed a side-to-side motion in the eyes—an ocular flutter—sometime in March. Tr. at 96.

**12.** A Babinski test is a reflex indicator measured through the big toe. A positive test is indicative

of organic hemiplegia. *Dorland's Illustrated Medical Dictionary* at 1438 (27th ed. 1988).

**13.** This fact is significant only in that children with brain tumors often vomit because of increased intracranial pressure. Tr. at 66.

**14.** As Dr. Scollins testified, ataxia is a "severe imbalance of lurching, wide based unsteadiness of gait ... [it] often implies that the upper extremities are involved with uncoordination and shaking." Tr. at 77.

§ 300aa–11(c)(1)(C)(ii)(I), *or* he sustained an injury set forth in the Table beyond the specified time frame but which was caused by the administration of the vaccine; § 300aa–11(c)(1)(C)(ii)(II);

(4) the child suffered the residual effects of a vaccine-related injury for more than six months and as a result of that injury, petitioners incurred more than $1,000 in unreimbursable expenses; § 300aa–11(c)(1)(D)(i); and

(5) petitioners have not previously collected a judgment or settlement in a prior or pending civil action. § 300aa–11(c)(1)(E).

In addition, where as here, the injured person is a minor, the petition must be brought by his legal representatives. § 300aa–11(b)(1)(A).

Once the petitioners establish their prima facie case, the burden then shifts to the respondent who must prove by a preponderance of the evidence that the claimed injury is attributable to some factors unrelated to the vaccine. § 300aa–13(a)(1)(B). Such factors may not include "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition." § 300aa–13(a)(2)(A).

In this case, petitioners contend (1) that the child suffered an encephalopathy within 15 days of receiving an MMR vaccine and suffers severe brain damage and moderate retardation as a result. *See* Petition for Vaccine Compensation, *Doe v. Secretary of Health and Human Services,* (Cl. Ct.) (hereafter "Petition"). Alternatively, petitioners maintain (2) that the vaccine significantly aggravated an illness, injury, disability or condition not set forth in the Table; or, (3) that the vaccine caused a Table injury, the symptoms or manifestations of which did not occur within the specified time period. Petition at 5; *see also* Petitioner's Prehearing Memorandum, *Doe v. Secretary of Health and Human Services,* (Cl.Ct.) (hereafter "Prehearing Memo").

For the reasons set forth herein, the undersigned finds that the evidence presented by petitioners fails to demonstrate by a preponderance of the evidence that the child suffered an encephalopathy within fifteen days of the administration of the MMR vaccine administered on March 9, 1979. Similarly, the record fails to establish by a *preponderance of the evidence* that the MMR vaccine in question either caused an injury not listed on the Table or that the child suffered a compensable injury beyond the specified time period which in fact was caused by the administration of the vaccine.

## III.

### MOTION FOR DEFAULT

■ As a preliminary matter, the undersigned notes that petitioners have a motion for default judgment pending. Essentially, petitioners contend that since respondent has withdrawn and failed to answer in this matter, respondent has voluntarily defaulted. Prehearing Memo at 7. In support of its contention, counsel cites Vaccine Rule 55(c) which provides, in part:

*Judgment Against Respondent.* No judgment by default shall be entered against the respondent unless the petitioner establishes a claim or right to relief satisfactory to the judge.

Petitioners maintain that they have established such a right.

Petitioners are correct in stating that where the United States has, as here, virtually abandoned a case, they are entitled to a default judgment if they present evidence of a claim or right to relief satisfactory to the judge. Petitioners may well be right in concluding that the evidentiary showing required in such an instance is less than the substantive standard of proof demanded by the Act.[15] Nonetheless, for the reasons stated below, even under any such relaxed standard of review, petitioners have not submitted evidence satisfactory to the undersigned establishing a right to relief.

---

**15.** *See* Prehearing Memo and cases cited therein. This court does not need, however, to reach that issue in order to dispose of this case, and accordingly, reserves that question for another date.

IV.

## DISCUSSION

In determining whether petitioners are entitled to compensation under the Vaccine Act, certain threshold issues must be reached. First, § 300aa–14(a)(II) lists MMR as a covered vaccine. The evidence on the record clearly proves that the child received an MMR vaccination on March 9, 1979. Ex. 1 at 29, 73. § 300aa–11(c)(1)(A). It is also beyond dispute that the MMR vaccine was administered in the United States. *Id.* § 300aa–11(c)(1)(B)(i)(I). Finally, the Table lists an encephalopathy as a potential MMR-related condition. § 300aa–14(a)(II)(B).

■ The evidence supports a finding the child suffered an encephalopathy. The Vaccine Act sets forth certain aids to interpretation as a complement to the Vaccine Injury Table. Under those aids, the term "encephalopathy" is defined as "any significant acquired abnormality of, or injury to, or impairment of the function of the brain," of which "focal and diffuse neurological signs" are among the frequent manifestations. § 300aa–14(b)(3)(A). In the instant case, Dr. Scollins testified that the child was suffering an encephalopathy when she saw him in May 1979. Tr. at 86. Ataxia, jerky irregular eye movements (octoclonus), severe uncoordination and loss of balance and speech were all considered symptomatic. Tr. at 86–87. On May 7, 1979, Dr. Emery described the child's condition as "ataxia, probably secondary to cerebellar dysfunction." Ex. 1 at 38. The undersigned finds that these symptoms fall within the term "encephalopathy" as defined by the Act.

■ Once these preliminary findings are made, the court must then determine the issue of causation. Essentially, causation in vaccine cases can be established in one of two ways: either through a presumption of causation by establishing an "on the Table" injury, or by proving causation in fact. Petitioners must prove one or the other in order to recover under the Act.

### On the Table Claim

■ The Vaccine Injury Table lists certain injuries and conditions which, if found to occur within a prescribed time period, create a rebuttable presumption that the vaccine caused the injury or condition. § 300aa–14(a). Among other things, petitioners have alleged an on the Table injury. The Table lists an encephalopathy which occurs within fifteen days as a compensable injury. § 300aa–14(a)(II)(B). Accordingly, if petitioners can prove by a preponderance of evidence that the child's encephalopathy, or a symptom of his encephalopathy, occurred in the 15 days following March 9, 1979, causation is presumptively established. § 300aa–11(c)(1)(C)(i).

■ Assuming the existence of an encephalopathy, petitioners have failed to carry their temporal burden. Only the testimony of Mr. Doe, the child's father, arguably places this claim within 15 days after the administration of the MMR vaccine on March 9, 1979.[16] Mr. Doe was the last witness to testify at the August 30, 1989, hearing. Mr. Doe recalled that in March, he noticed a difference—a slight "side-to-side eye movement"—so "subtle," he wondered "whether he was imagining things or not." Tr. at 96–97. Mr. Doe claims he can place the incident in time because it occurred sometime before the birthday of his other son, on March 20, 1979. Tr. at 96.

The date on which the child first exhibited symptoms of encephalopathy is crucial in determining whether petitioners are entitled to a presumption of causation. Although Mr. Doe testified that he first observed an ocular flutter in the child within the statutory 15 day time period, petitioners' exhibits present contrary evidence as to when such symptoms actually occurred. The Vaccine Act instructs that a finding for the petitioners may not be made on the claims of petitioners alone. A favorable finding must be substantiated by medical

---

16. The grandmother's testimony also referred to early symptoms. Tr. at 90–91. However, when questioned, she could not accurately place the occurrence of those symptoms in time. Tr. at 93–94.

records or medical opinion. § 300aa–13(a)(1). The issue, then, is whether the event of the first symptoms of encephalopathy has been substantiated by other evidence.

Mr. Doe's recollection relates to events which happened over ten years ago. Significantly, his testimony is at odds with the contemporaneous medical documentation submitted. In the time directly following the child's severe onset of ataxia, Mr. Doe accompanied the child to the hospital on May 8, 1979, and participated in giving the child's medical history to the physicians. Tr. at 100. Particularly, he discussed seeing the child's ocular flutter. Tr. at 99–101; Ex. 1 at 31. Nonetheless, all of the contemporaneous medical records in evidence reflect that the child's symptoms, including the ocular flutter, first were evident no earlier than two to three weeks before May 7, 1879. Ex. 1 at 31, 37. Since the vaccination in question was administered on March 9, 1979, this would place the symptoms outside the 15 day period within which a presumption of causation would be established.

There is no contemporaneous medical documentation which supports a finding that the child exhibited symptoms of encephalopathy within 15 days of receiving the MMR vaccination on March 9, 1979. Further, there is no medical opinion which supports such a finding. Thus, while the court may find that the first symptom of a Table injury occurred within the statutory time period even though the symptom may not have been recorded, or was incorrectly recorded, (see § 300aa–13(b)(2)) such finding must still be demonstrated by a preponderance of the evidence.

Given the record as a whole, and considering the contemporaneous nature of the medical history given to the physicians in May 1979, the undersigned is unable to find that Mr. Doe's testimony, standing alone, establishes by a preponderance of the evidence that the child's first symptoms occurred within the statutory time period. In this case, a preponderance of the evidence supports a finding that the first symptom occurred outside the statutory time period. As petitioners have not established entitlement to a presumption of causation, further inquiry must be made as to whether petitioners have proven actual causation.

*Off the Table Claim*

To establish a compensable off the Table claim, the petitioners must prove an actual causal relationship between the administration of the vaccine and the injury—they do not enjoy a presumption of causation. In the instant case, giving the evidence its most liberal credible interpretation, at *least* five weeks passed from March 9, 1979—the date of the MMR vaccination—to the first sign of any symptom of injury. At a minimum, then, this case falls three weeks off the Table.

 In order to prove causation, petitioners presented testimony from Dr. Mary Scollins, who first saw the child when he was admitted to the hospital in May 1979. By letter dated October 6, 1988, from Dr. Scollins to petitioners' counsel, Dr. Scollins stated:

> In reviewing the previous records I do feel that it is *highly possible* that the encephalopathy the child developed was related to the measles, mumps, rubella immunization *as the symptoms began about 6 weeks following the immunization* and symptoms followed almost immediately after he recovered from a significant upper respiratory infection which developed about one week after the immunization.

Ex. 1 at 23 (emphasis added). Certainly, the letter quoted above is some indicia of causation. However, an assertion that something is "highly possible" does not rise to the level necessary to establish causation by a preponderance of the evidence, and accordingly, petitioners' contention that the statute compels this court to consider that evidence "dispositive" on the issue of causation is simply overstated.[17]

---

17. Similarly, petitioners' reliance on § 300aa–14(b)(3)(B) is misplaced. *See* Prehearing Memo at 4. That section states that where

there is not a preponderance of the evidence as to the causation of a particular encephalopathy, then the encephalopathy is presumed a "condi-

*See* Prehearing Memo at 4. Rather, this court is *obligated* to examine the basis underlying that opinion,[18] particularly where, as here, petitioners offer no other competent medical testimony in support of causation.[19]

In examining Dr. Scollins' October 1988 letter and subsequent testimony, the undersigned finds that they do not form a basis to conclude that a preponderance of the evidence suggests that the child's encephalopathy, or any apparent injury or condition, were caused by the March 9, 1979, administration of vaccine. As an initial matter, it is unclear if Dr. Scollins, although certainly a knowledgeable developmental pediatrician, is qualified to give an opinion on the etiology of a neurological disorder.[20] Even assuming that Dr. Scollins is qualified to levy such an opinion, her opinion on the cause of the child's condition remained equivocal. When asked whether his injuries might have resulted from the immunizations, she felt that it "seem[ed] possible." Tr. at 81.[21] When asked directly if she held that opinion to a reasonable degree of medical certainty or probability, she was unable to give an unqualified answer.[22] Tr. at 83, 84, 85. Her October 1988 letter does not, as petitioners would have this court believe "conclude" that the child's "injury, subsequent brain damage and mental retardation were caused directly by his vaccinations on March 9, 1979." Prehearing Memo at 4.

Plainly put, petitioners have attempted to imbue a meaning to Dr. Scollins' statements which simply is not there. In order to find a preponderance of the evidence, the trier of fact must "believe that the existence of a fact is more probable than its nonexistence before [the special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *In re Winship*, 397 U.S. 358, 370, 371, 90 S.Ct. 1068, 1075, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring), *quoting* F. James, Civil Procedure 250–251 (1965). Mere conjecture or

tion" set forth in the Table. It does not follow, however, that any such injury is *compensable*. Simply because a Table *condition* is proven does not obviate the inquiry into causation. Under petitioners' reading, *any* encephalopathy of unknown origin would automatically entitle the victim to compensation, regardless of its relation to the administration of the vaccine. This assertion is insupportable.

18. The Act provides, that although a court shall consider any diagnosis contained in the record, § 300aa–13(b)(1)(A),
 Any such diagnosis, conclusion, medical judgment, test result, report, or summary *shall not be binding on the court.* In evaluating the weight to be afforded to any such diagnosis, [etc.] the court shall consider the entire record and the course of the injury, disability, illness, or condition.
 § 300aa–13(b)(1) (emphasis added).

19. Dr. Clark never expressed any opinion on the etiology of the child's symptoms and admitted on the record, as a pediatrician, that such a judgment was beyond the scope of her expertise. Tr. at 67, 70–71; Ex. 1 at 30. In fact, Dr. Clark testified at the hearing, "I don't really know what caused it [the illness]." Tr. at 71–72. She deferred any opinions on diagnoses to neurologists. Tr. at 71. Similarly, except for Dr. Scollins' statement of 1988, none of the child's neurological records ever suggest a vaccine reaction as a cause of his condition.

20. As she testified, she has only one year of training in child neurology. Tr. at 73. Although she was employed in child neurology from 1974 until 1979, she is not board certified in neurology and, for the past ten years, her work has been in the field of child development. Tr. at 74. She has no particular expertise in vaccine-related injury, and admitted on the record that, "this is not my area of expertise. I am not an immunization expert." Tr. at 85. Where the petitioners must prove not simply that certain identifiable symptoms exist, but that the *vaccine* in question *caused* those injuries, the expertise of the witness becomes critical.

21. Dr. Scollins repeatedly said the vaccines were a "possible" cause. Tr. at 83, 84, 85, 89. Only once in her October letter when she described them as a "highly" possible cause, and twice during the hearing, when she characterized them as a "quite possible" cause was she ever less equivocal. Tr. at 83, 84; Ex. 1 at 23. She was unable to offer any opinion as to which vaccine, the DPT or the MMR was the basis of her opinion. Tr. at 85–86.

22. The only time she was able to give a definite answer was when asked by the special master,
 ... to summarize your testimony, ... is it fair to say that by a process of elimination, that you feel it is possible that the child's ataxia and encephalopathy were the result of the administration of an MMR shot[?]
 Dr. Scollins responded, "yes." Tr. at 89.

**452**

speculation will not establish a probability. *Snowbank Enter. v. United States,* 6 Cl.Ct. 476, 486 (1984). Certainly, a vague statement that something may be possible cannot serve as the linchpin for meeting a burden of proof by the preponderance of the evidence.[23]

In sum, petitioners have failed on every front to establish the requisite causal link entitling them to compensation.

V.

### ATTORNEYS' FEES AND COSTS

█ The Vaccine Act provides that a judgment on a petition awarding compensation under the Act shall include an amount to cover reasonable attorneys' fees and other costs. § 300aa–15(e). A court may, in its discretion, award fees regardless of whether or not petitioners prevail on the merits so long as counsel brought the petition in good faith and had a reasonable basis for doing so.

The statute states, in pertinent part:
The judgment of the United States Claims Court on a petition filed under section 300aa–11 of this title awarding compensation shall include an amount to cover—

(A) reasonable attorneys' fees, and

(B) other costs,

incurred in any proceeding on such petition. If the judgment of a court on such a petition does not award compensation, *the court may include in the judgment an amount to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the court determines that the civil action was brought in good faith and there was a reasonable basis for the claim for which the civil action was brought.*

§ 300aa–15(e) (emphasis supplied).

The drafters' use of the phrase "civil action" instead of "petition" would seem to indicate a different proceeding than the one initiated under the petition. However, it appears that the use of "civil action" and "petition" are interchangeable for purposes of this sentence alone. First, the subject of the section concerns an award for fees and costs incurred in a proceeding on a petition. It would appear that the reference to "civil action" is mistaken. Moreover, where the statutory language is unclear or ambiguous on its face, the court is then bound to review the applicable legislative history to discern the intent of Congress. *Yerxa v. United States,* 11 Cl.Ct. 110, 125 (1986), *aff'd,* 824 F.2d 978 (Fed.Cir. 1986), *citing Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

The legislative history of the Vaccine Act supports the contention that attorneys' fees may be awarded on an unsuccessful petition:

If the court does not award compensation on a *petition,* it may, in its discretion, nonetheless make such an award for attorneys' fees and costs if it determines that the action was brought in good faith and that there was a reasonable basis for the claim for which the action was brought.

See H.R.Rep. No. 908, 99th Cong., 2d Sess. 21, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6362. (emphasis supplied).

█ While this special master recommends a finding that a preponderance of the evidence does not support petitioners' claim, petitioners have submitted testimonial evidence and medical documentation of encephalopathy as well as expert opinion testimony which petitioners, in good faith, believed supportive of their claim. Thus, in the opinion of the undersigned, petitioners' claim was brought in good faith and there was a reasonable basis to support it.

*Calculation of Reasonable Attorneys' Fees.*

█ This court has determined that the appropriate method for computation of attorneys' fees awarded under the Act is the "lodestar" model approach. *See Gregson*

---

**23.** Nor does that isolated statement satisfy the undersigned that petitioners have established a

claim or right of relief entitling them to a default judgment.

v. Secretary of the Dept. of Health and Human Services, No. 88–1V, slip op. at 7 (Cl.Ct., April 24, 1989). The lodestar is the product of the reasonable hours expended times a reasonable hourly rate. The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Counsel for petitioner has submitted a petition for attorneys' fees and costs and consists of the following time and expenses:

LEGAL TIME CHARGES

| Attorney | Hours | Rate | Charge |
|---|---|---|---|
| Paul Dannenberg | 186.2 | $90.00 | $16,758.00 |
| EXPENSES | | | $896.30 |
| Total Fees and Expenses | | | $17,654.30 |

See Petitioner's Motion for Attorney's Fees, Doe v. Secretary of Health and Human Services, (Cl.Ct.) (filed Oct. 13, 1989) (hereafter "Fee Petition").

██ The fee applicant carries the burden of proof. To meet such burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As the Claims Court in Martin v. United States wrote:

A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.

Martin v. United States, 12 Cl.Ct. 223, 227 (1987), citing Hensley v. Eckerhart, 461 U.S. at 429, 433, 441, 103 S.Ct. at 1937, 1939, 1943.

The reasonable hourly rate is "the prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. Blum v. Stenson, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). The Supreme Court noted in Blum that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult." Blum, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. In discussing the applicant's burden, the Court stated that:

To inform and assist the court in the exercise of its discretion [to award fees], the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

Id. at 895 n. 11, 104 S.Ct. at 1547 n. 11. Proof of prevailing market rates may be demonstrated in a number of ways, including:

(1) Affidavits of other attorneys or experts;

(2) Citations to prior precedents showing reasonable rate adjudications for the fee applicant, for comparable attorneys, or for comparable cases;

(3) References to fee award studies showing reasonable rates charged or awarded in the relevant community;

(4) Testimony of experts or of other attorneys in the relevant community:

(5) Discovery rates charged by the opposing party;

(6) Reliance on court's own expertise to recognize applicable prevailing rates.

Newberg, ATTORNEY FEE AWARDS 198 (1986).

██ In support of his claimed hourly rate, petitioners' attorney, Paul Dannenberg, notes that he has a general civil practice, including divorce, personal injury and real estate and that $90.00 is the rate he charges for all litigation work handled on an hourly basis. Fee Petition at 15. Further, Mr. Dannenberg submitted affidavits from three members of the Vermont bar attesting that such rate is reasonable in the community in which he practices. See Fee Petition at 17–19. The undersigned finds that such rate is fair and reasonable.

██ To demonstrate "reasonable hours" worked, the applicant should pro-

vide contemporaneous time records and a personal affidavit in support of the fee petition. *Grendel's Den v. Larkin*, 749 F.2d 945, 952 (1st Cir.1984) (failure to keep records can result in a drastic reduction of fees). Mr. Dannenberg documents a total of 186.2 hours. Fee Petition at 112.

In reporting time expended, the applicant need not account for every minute. However, "at least counsel should identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437, n. 12, 103 S.Ct. at 1941, n. 12. Once counsel appropriately identifies his time, those hours which reflect "excessive, redundant, otherwise unnecessary" hours must be excluded by the court. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939. In requesting statutory fees, an attorney must use the same "billing judgment" as an attorney would in billing a client. "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940.

In the instant case, certain expenditures of time clearly exceed the above criteria and must be discounted. The ultimate goal in any fee shifting statute is not to "produce windfalls" but to "award fees adequate to attract competent counsel." *Grendel's Den*, 749 F.2d at 950, *citing Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Accordingly, time spent in attaining admission to the Claims Court must be discounted.[24] Such time is not properly billable here as it is a necessary prerequisite to practice before the Claims Court.

Further, certain expenditures of time appear excessive for the nature of the task involved.[25] Other time claimed, while not excessive in and of itself, was spent on research only peripherally related to vaccine injury cases.[26] Finally, time spent on essentially ministerial and in some cases secretarial tasks can not be compensated.[27] Items such as collating copies, taking documents to be notarized, issuing form affidavits, and organizing papers to be filed simply do not warrant the expenditure of attorney time.

The total number of hours that are clearly noncompensable is 36.4. Counsel's requested hours in this case are thus reduced to 149.8.[28] With the exception of the cost of admission to the Claims Court ($25.00), counsel's remaining expenses of $871.30 are all fair, reasonable and appropriately documented. Fee Petition at 12–14.

Accordingly, the special master recommends a finding that reasonable attorneys' fees and costs be awarded as follows:

| | | |
|---|---|---|
| Fees | 149.8 hours at $90.00/hr. = | $13,482.00 |
| Costs | | $871.30 |
| | Total Fees and Costs | $14,353.30 |

**24.** Disallowed time attributable to admission and other prefatory matters is as follows: 7/29/88 (.8); 8/2/88 (1.2); 8/4/88 (.4); 10/5/88 (.2); 10/6/88 (.4); 10/18/88 (1.2); 10/18/88 (.1); 10/20/88 (1.3); 10/21/88 (1.0); 11/2/88 (.5); 11/4/88 (1.0); 11/6/88 (2.2); 11/17/88 (.3); 12/7/88 (.3). The hours must therefore be reduced by 10.9 hours.

**25.** The affidavit prepared on 12/15/89 and 12/27/89 is slightly over three pages. A reduction of the claimed 4.1 hours to 2.0 hours is more than generous (2.1). Similarly, the 3.3 hours spent on 1/11/89 to draft the one page supporting affidavit is clearly an excessive and unnecessary expenditure of attorney time. The time in that instance is reduced to .3 hours (3.0), giving a total of 5.1 hours in reductions.

**26.** On 1/9/89 the time spent researching contingency fees can not be allowed (2.0). The prohibition against contingency fees under the Act is

patently clear. Similarly, the statute of limitation research of 1/20/89 (1.1) may not be claimed—that issue was never raised in this case and the rule is plain under the Act. Reductions total 3.1 hours.

**27.** The following are therefore disallowed: 1/23/89 (2.0); 1/26/89 (1.5); 2/8/89 (5.5); 5/11/89 (.5); 7/12/89 (.3); 7/17/89 (.3); 7/20/89 (.5); 8/3/89 (2.2); 8/7/89 (.5); 8/9/89 (1.0); 8/10/89 (.3); 8/28/89 (2.7). These reductions total 17.3 hours.

**28.** It should be noted that this number is still quite high, considering the no-fault nature of the proceedings. However, recognizing that this is a new program which requires additional time for counsel to familiarize himself with a new statutory structure, the undersigned is not inclined to further reduce the number of compensable hours, particularly in light of the reasonable hourly rate claimed.

## VI.

### ULTIMATE FINDINGS OF FACT

(1) The child was administered an MMR vaccine on March 9, 1979.

(2) There is not a preponderance of the evidence on the record that the child suffered an encephalopathy within 15 days of the administration of the MMR vaccine on March 9, 1979.

(3) There is not a preponderance of the evidence on the record proving a causal link between the child's injury and the administration of the vaccine.

## VII.

### CONCLUSIONS OF LAW

(1) Petitioners are not entitled to a default judgment against the respondent.

(2) Petitioners are not entitled to compensation under the Vaccine Act.

(3) Reasonable attorneys' fees and costs should be awarded in the amount of $14,-353.30.

IT IS SO RECOMMENDED.