Barbara G. ZEAGLER, Petitioner,

v.

SECRETARY OF THE DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 88–18 V.

United States Claims Court.

Dec. 11, 1989.

Order On Motion for Reconsideration
Feb. 20, 1990.

Michael R. Hugo, Schlichtmann, Conway, Crowley and Hugo, Boston, Mass., for petitioner.

ORDER

(i) REMANDING FOR
FURTHER EVIDENCE

and

(ii) ESTABLISHING CRITERIA FOR
AWARD OF ATTORNEYS' FEES

WIESE, Judge.

I

This suit involves a claim for compensation under the National Childhood Vaccine Injury Act of 1986, as amended, 42 U.S.C. §§ 300aa–1—300aa–34 (Supp V.1987). As contemplated by the Act, the matter was

referred to a special master for the preparation of proposed findings of fact and recommended conclusions of law. The special master's report, issued October 13, 1989, reaches the following principal conclusions:

(i) to a reasonable medical certainty, petitioner is suffering from post-rubella panencephalitis, which, as a form of encephalopathy, is a disorder recognized by the Vaccine Injury Table, 42 U.S.C. § 300aa–14;

(ii) a preponderance of the evidence supports a finding that the petitioner's disorder was caused by administration of the rubella vaccine;

(iii) the record is devoid of evidence sufficient to support an alternative causation for petitioner's injuries; and

(iv) petitioner's disorder is progressive and debilitating; it has, to date, led to substantial disability that is likely to increase and is likely to reduce her life expectancy.

Based on the foregoing, the special master recommended judgment for petitioner in the amount of $933,724,[1] this sum to include the following elements of compensation: recurring expenses (reduced to net present value) of $863,719, non-recurring expenses of $40,005, an award for pain and suffering of $12,352 and reasonable attorneys' fees and costs of $17,648.

Neither side has filed an objection to the special master's recommendations. The court, acting on its own motion, has examined the record and agrees with the special master's proposed findings of fact and conclusions of law regarding the nature and cause of petitioner's injuries; accordingly, we adopt those findings. However, the court does not agree with the amount recommended for award. For reasons we explain below, neither the amount of compensation proposed for recurring expenses nor the amount allowed for attorneys' fees and costs is supportable.

## II

■ A. *Recurring Expenses* —The special master concluded that because of the progressive nature of petitioner's disease and the anticipated worsening of her symptoms she would require the services of a licensed practical nurse on a full-time basis (*i.e.*, 24 hours per day) beginning in 1994. The cost of this care was estimated at $130,273 per year or $1,954,095 over the projected 20 years of petitioner's remaining life. When adjusted for annual increases due to inflation and then reduced to present value, this figure comes to $671,-510.[2] This amount was included in the total of recurring future expenses recommended for award.[3]

In support of his conclusion, the special master relied on the report of petitioner's expert, Dr. Marcel Kinsbourne, and medical literature relating to progressive rubella panencephalitis. In our view, however, neither of these evidentiary sources warrants a conclusion that the course of the petitioner's disease will necessitate full-time custodial care by a licensed practical nurse five years hence. Consider first the report of Dr. Kinsbourne. In the section of his report captioned "Opinion" Dr. Kinsbourne wrote:

> The recurrent arthritic and neurological syndrome that Ms. Zeagler has experienced is typical of a rubella aftermath, and there is no other reasonable explanation. Her problems in higher mental function are part of this syndrome, and consistent with the cerebral demyelination reported on MRI [magnetic resonance imaging]. To a reasonable medical certainty, Ms. Zeagler is suffering from a vaccine related injury, a post rubella panencephalitis. This condition will persist and may become worse, to the point that she is incapacitated and in need of custodial care. No curative treatment is available. (Underscoring added.)

Next, consider the 1982 article titled "Neuropathology of progressive rubella panencephalitis after childhood rubella" that appeared in the medical journal "Neurology." The opening sentence of this article reads as follows:

> Progressive rubella panencephalitis (PRP) is characterized by progressive ataxia, spasticity, and dementia usually

---

1. Because of arithmetic corrections, the figure we show differs from that reported by the special master. All numbers appearing in this order have been rounded to the nearest dollar.

2. This figure takes into account that payments do not begin until 1994.

3. The other recurring costs included in the special master's recommendation are: a certified nurse assistant for the 5 year period 1990–1994 —$135,245, Medicare for 20 years—$12,417, physical fitness center for 20 years—$3,110, wheelchair costs for 20 years—$5,067, care and comfort items for 20 years—$6,725, and psychological counseling for 2 years—$14,285. (All numbers shown represent present values.)

in the second decade. (Underscoring added.)

Townsend, Stroop, Beringer, Wolinski, McKerrow & Berg, *Neuropathology of progressive rubella panencephalitis after childhood rubella*, 32 Neurology 185 (1982).

The special master based his conclusion on the underscored language. Fairly read, however, this language shows only that petitioner is afflicted with a disease that may worsen to the point that custodial care will be required. Plainly, the evidence is not sufficient to support a present money judgment for the costs of round-the-clock nursing care beginning in 1994. The matter must be returned to the special master to obtain further evidence as to (1) the likelihood of petitioner's further deterioration; (2) the rate at which that deterioration is expected to occur (*i.e.*, over what period of years); and (3) most importantly, the nature and extent of the *medically appropriate* care her future condition will require, *i.e.*, whether hospitalization or at-home custodial care, and if the latter, the daily number of hours that might reasonably be necessary.[4]

B. *Attorneys' Fees*—The Vaccine Act authorizes the awarding of reasonable attorneys' fees and other costs. *See* 42 U.S.C. § 300aa–15(e). In determining the amount allowable as a reasonable attorney's fee in this case, the special master relied on the so-called "lodestar" approach, *i.e.*, the number of hours reasonably expended on the litigation times a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Guided by this method, the special master accepted as reasonable the 38.62 attorney hours claimed ("duplicative hours," he noted, "have been carefully avoided") but reduced the requested $275 hourly rate to $250, noting that "respondent played no role in this case." From these numbers comes the final figure recommended for judgment—an attorney's fee of $9,665.

 We cannot accept this figure. Although the lodestar approach yields a market-based value and therefore is presumed to be reasonable, it is, nevertheless, an initial estimate only—one which a court

may adjust "where the fee charged is out of line with the nature of the services rendered." *Pierce v. Underwood*, 487 U.S. 552, 108 S.Ct. 2541, 2558, 101 L.Ed.2d 490 (1988) (Brennan, J., concurring); *see also Blanchard v. Bergeron*, —— U.S. ——, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989). As the court sees this case, a downward adjustment of the hourly fee is necessary.

Petitioner justified the hourly fee that was demanded ($275) (and the special master similarly justified the $250 hourly fee that was allowed) on the ground that it corresponded to the rates charged by attorneys litigating personal injury and wrongful death cases. This comparison does not fit here: the successful presentation of a claim for vaccine injury compensation does not demand the skills of a seasoned trial lawyer, nor are the issues in such suits factually or legally complex.

A suit under the Act was meant to be, and is, a straightforward proposition. The Act: (i) lays out the elements of proof that a petition must contain, 42 U.S.C. § 300aa–11; (ii) places control of the fact-gathering procedure in the hands of the special master, *id.* § 300aa–12(c); (iii) permits recovery without regard to proof of fault or negligence on the part of the vaccine manufacturer and, in the case of the so-called "Vaccine Table" injuries, without proof of causation, *id.* § 300aa–13, and (iv) permits the reimbursement of attorneys' fees, even to an unsuccessful claimant, if the court determines that the claim was brought in good faith and upon a reasonable basis, *id.* § 300aa–15(e)(1)(B).

Given these characteristics of the Act, we do not think that suits under the statute can be viewed as litigation in the traditional sense. Rather, considering the broad supervisory role assigned to the special master, it would be more accurate to label the process "inquisitorial" rather than "adverserial." In such a situation, a vaccine claimant needs less the services of a lawyer than those of a medical expert.

This is not to say that a lawyer cannot meaningfully assist a claimant in securing the compensation contemplated by the statute. To the contrary, the lawyer's ability to focus on the legally relevant facts in a given situation contribute significantly to

---

4. Although we leave undisturbed the special master's recommendation that petitioner receive the services of a certified nurse assistant for 8 hours per day through 1994, better supporting evidence on this point would be helpful. On the basis of petitioner's medical records, it is clear that her present condition warrants that she be given some assistance in accomplishing the chores of daily living. It is not clear, however, that current circumstances justify the recommended 8 hours per day.

the proper and persuasive presentation of a claim. This skill notwithstanding, these cases do not demand the full range of legal skills of the top-notch personal injury litigator. And a fee that is based strictly on the superior skills that a lawyer possesses, and does not reflect the lesser skills necessary for the tasks at hand, is not a reasonable fee.

The last point is clearly seen in the American Bar Association's Model Rules of Professional Conduct. Rule 1.5 sets forth the requirement that a lawyer's fee be reasonable. The rule goes on to list the factors to be considered in determining the reasonableness of the fee. First among these factors is the following:[5]

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly....

Except for the relatively minor adjustment made by the special master (the decrease in hourly fee from the requested $275 to the recommended $250), there is nothing in the record to suggest that the fee in question was adjusted to the realities of a vaccine compensation suit. Thus, we deem the fee unreasonable because it fails to acknowledge the lesser skills necessary to the proper and efficient presentation of the claim.

The question, then, is how to fix the fee appropriate to the case. Clearly, the court does not wish to discourage the participation of lawyers, like petitioner's counsel, whose knowledge of the Act and whose experience in related litigation make their services both efficient (in terms of hours required) and valuable to the court. Moreover, since Congress did not place a cap on the amount of attorneys' fees that could be recovered the court must presume that the statute contemplates a market-based rate.

With these considerations in mind, we adopt a rate that corresponds to the typical billing rate of the major law firms in the Boston area (the location of petitioner's counsel) for their senior associates and junior partners. It is here that we can expect to find the market rate appropriate to the level of skill necessary to do the work—and to do it well. This information, which we have in the record in the form of a 1988 National Law Journal survey of the nation's largest law firms, reveals that for the 7 reporting Boston area firms, hourly charges ranged from a low of $145 to a high of $200 with the average being $175 and the median being $165. We conclude from this information that $170 per hour is a reasonable market rate for the attorney skills necessary to the efficient and proper presentation of a vaccine compensatory claim.[6]

▆ In addition to attorneys' fees, the special master also recommended that the court allow paralegal fees of $65.00 per hour for 18.68 hours. The individual for whom this fee is sought holds a graduate degree in nursing and is completing her final year in law school. While the fee seems high, the court admits to a lack of experience regarding such fees and therefore accepts the special master's judgment in the matter.

C. *Costs*—Among the costs allowed by the special master was an annuitist's fee of $500. The court is unable to comprehend how the handful of present value calculations that this case required could possibly justify this fee. Unless there is a better explanation than any now apparent from the record, the annuitist's fee must be reduced to $100. And even this figure is generous to an extreme.

### III

The case is returned to the special master for further evidence and additional findings on the issue of recurring costs. Within 50 days from the date of this order, the

---

**5.** The other factors set out in the rule are these:
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional relationship with the client;
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) Whether the fee is fixed or contingent.

**6.** The hourly fee we endorse here is not meant to establish a standard for like cases that may come before this court. Rather, in the interests of avoiding a second round of litigation on the issue of attorneys' fees, we have decided this case on the bases of the limited evidence now before us. In future cases, however, more complete evidence as well as more informed argument may well dictate a standard for attorneys' fees different from that accepted here.

special master shall file a supplementary report covering the matters addressed in this order together with a recommendation for judgment, shown both in total amount and by each component of the award.

## ORDER

On December 11, 1989, the court entered an order in this Vaccine case restricting the attorney's fee to $170 per hour and the annuitist's allowable cost to a flat charge of $100. By motion filed February 7, 1990, petitioner's counsel asks that we reconsider this ruling.

We have examined the arguments presented in counsel's motion and, except for two minor adjustments, are not persuaded to depart from our earlier decision. The basic rationale which guided the court in that decision was the fact that vaccine cases cannot be viewed as litigation in the usual sense and therefore do not warrant attorney compensation determined on such a basis. Counsel's motion for reconsideration fails to come to grips with this essential fact.

The justification of a reasonable attorney's fee is not just a matter of identifying a fee that corresponds to contemporaneous rates or that reflects counsel's usual charges. Rather, the analysis must also take into account the level of skill necessary to the fair and efficient presentation of a petitioner's claim. Vaccine claims—as we earlier pointed out—are resolved within the framework of an inquisitorial process rather than an adversarial one. The cases, therefore, are neither discovery intensive nor dependent, in outcome, on the skills of a seasoned trial lawyer. Moreover, the cases are not intellectually rigorous—they demand little acknowledge of the law beyond the specifics of the Vaccine Act itself.

It therefore remains the court's view that the compensation standard adopted in our order represents a fair measure of a reasonable attorney's rate given, on the one hand, the procedural and substantive simplicities which characterize the presentation of a claim under the Act, and, on the

other hand, counsel's acknowledged expertise and exceptional efficiency.[7] The standard we adopted was taken from the upper range of billing rates for senior associates and junior partners in the Boston area's[8] major law firms as reported in a 1988 National Law Journal survey. We chose the mid-point between the average figure and the median figure; we adhere to that here.

Counsel's motion points out that, even if we do adhere to our earlier approach, a change in rates is appropriate based on the higher figures shown in the 1989 National Law Journal survey. We agree with this correction. The 1989 figures (not available to counsel at the time of initial briefing) reveal an average billing rate (measured across the upper range of those rates) of $180 per hour and a median rate (again taken from the upper end of the scale) of $185 per hour. We adopt the $185 per hour figure.[9]

In addition to a modification of the attorney's fee, counsel has also called our attention to the extensive amount of work that was required of the annuitist in this case and on the basis of which a $500 cost was incurred. Based on counsel's explanation of the annuitist's fee, we restore the original charge ($500) to the category of reimbursable costs.

---

7. From the time of filing of the petition through the date the special master's report was issued, petitioner's counsel had accumulated 38.62 hours and paralegal hours amounted to 18.68 hours. The court considers these hours to be exceptionally low.

8. Petitioner's counsel is located in the Boston area.

9. The point bears repeating that we regard counsel's hours as exceptionally low and his

performance exceptionally high. Counsel not meeting such standards of performance should not expect to be compensated at the $185 per hour figure. One further caveat is also in order: the hourly rate established in this order reflects a judgment which the court reached on its own without the benefit of respondent's views. Accordingly, more rigorous debate of the issue in the future might well produce a different result.