Miscellaneous Expenses
        Total requested        17,634.98
        Allowed . . . . . . . . . . . . . . . . . . . . . . . 7,243.10[16]

Total Expenses
        Actually incurred/recoverable        55,146.37

Total award . . . . . . . . . . . . . . . . . . . . . . . $894,855.60

## CONCLUSION

Accordingly, based on the forgoing,

1. The Clerk of the Court shall enter judgment for plaintiffs on their complaint in the amount of $234,000.00, plus interest from the date of the taking, February 5, 1986. Interest shall be calculated on an annual compound basis, using successive 52–week Treasury bill rates. *See NRG Co. v. United States,* 31 Fed.Cl. 659, 669 (1994).

2. Plaintiffs' application for attorneys' fees is granted consistent with this opinion. The Clerk of the Court shall enter judgment for plaintiffs on its application for fees and expenses under the URA in the amount of $894,855.60.

**IT IS SO ORDERED.**

Holden **RUPERT,** by his Mother and Next Friend Andrea **RUPERT,** Petitioner,

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 99–0774V.**

United States Court of Federal Claims.

May 30, 2002.

---

**16.** The amount allowed for Mr. Preseaults' miscellaneous expenses generally correlates to the amounts recognized by defendant as allowable in its March 13, 2002 brief. The amount allowed includes costs claimed by plaintiffs in their supplemental submissions, as well as certain travel costs objected to by defendant.

Ronald C. Homer, Boston, MA, for petitioner.

Michael P. Milmoe, Washington, DC, with whom was Assistant Attorney General, Robert D. McCallum, Jr., for respondent.

## OPINION

MILLER, Judge.

Before the court is respondent's appeal of Special Master John F. Edwards's award of attorneys' fees and costs to petitioner. In determining the lodestar calculation of a reasonable fee, the special master utilized his experience with cases brought under the National Childhood Vaccine Injury Act of 1986. 42 U.S.C. §§ 300aa–1 to 300aa–34 (1994 & Supp. V 1999) (the "Vaccine Act"), and his familiarity with the attorneys who prosecute these claims to set the rate at which fees were awarded. At issue is whether the special master properly awarded attorneys' fees at the prevailing market rate. Argument is deemed unnecessary.

## FACTS

On September 20, 1999, Andrea Rupert ("petitioner"), on behalf of her son Holden Rupert, filed a claim for compensation under the Vaccine Act. *Rupert v. Sec'y of HHS*, No. 99–9774V, 2002 WL 360005, at *1, 2002 U.S. Claims LEXIS 48, at *4 (Fed.Cl.Spec.Mstr. Feb. 14, 2002). Petitioner voluntarily withdrew her case on October 30, 2000. *Id.* at *3, 2002 U.S. Claims LEXIS 48, at *3. Petitioner then sought an award of attorneys' fees and costs under the Vaccine Act's mandatory fee-shifting provisions, which confer the special master with discretion to award compensation to a claimant who filed a petition in good faith and upon a reasonable basis, regardless of whether the petitioner prevailed. *See* 42 U.S.C. § 300aa–15(e)(1); *Martin v. Sec'y of HHS*, 62 F.3d 1403, 1405 (Fed.Cir.1995). The special master awarded petitioner $11,687.50 in attorneys' fees, representing 14.50 hours of work by Kevin Conway, Esq.,

at $250.00 per hour; 15.00 hours by Ronald Homer, Esq., at $225.00 per hour; 62.50 hours of paralegal work at $75.00 per hour; and $2,160.00 in costs. *Rupert*, 2002 WL 360005, at *11, 2002 U.S. Claims LEXIS 48, at *37–38.[1]

The special master's decision must be set aside if it is found "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 42 U.S.C. § 300aa–12(e)(2)(B). Respondent seeks review, arguing first that the special master applied the incorrect legal standard in determining the hourly rates. This is a question of law subject to *de novo* review. *Munn v. Sec'y of HHS*, 970 F.2d 863, 869–70 & n. 10 (Fed.Cir. 1992). Second, respondent challenges certain of the special master's findings as not supported by the evidentiary record. On this issue the court must apply a deferential standard. *Cucuras v. Sec'y of HHS*, 993 F.2d 1525, 1527 (Fed.Cir.1993).

## DISCUSSION

### 1. *Lodestar standard for fee awards*

■ The Vaccine Act allows recovery of "reasonable attorneys' fees and other costs." 42 U.S.C. § 300aa–15(e)(1). The court uses the "lodestar" method for determining the reasonable fee to be awarded. *Doe v. Sec'y of HHS*, 19 Cl.Ct. 439, 452–53 (1990); *Greene v. Sec'y of HHS*, 19 Cl.Ct. 57, 64 (1989). *See generally Penn. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (lodestar approach is consistent with fee-shifting statutes aimed at enabling parties to enforce federal laws). The lodestar method is a two-step process. *Hensley v. Eckerhart*, 461 U.S. 424, 433–44, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). First, the court determines the lodestar, an initial estimate of reasonable attorneys' fees. *Id.* at 433, 103 S.Ct. 1933. This lodestar is presumed to be the reasonable fee to which the applicant's attorney is

entitled. *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The burden is on the fee applicant to establish the lodestar. *Id.* at 895–96 n. 11, 104 S.Ct. 1541. In the second step, the court may make upward or downward adjustments necessary to keep the fee in line with the nature of the services rendered in the particular case. *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. The burden is on the applicant to justify an upward adjustment, the necessity of which must be supported by specific record evidence. *Blum*, 465 U.S. at 898, 901–02, 104 S.Ct. 1541. Conversely, the burden is on the party seeking a reduction of the lodestar to prove the necessity of a downward adjustment. *Id.* at 897, 104 S.Ct. 1541. Because the lodestar is presumed reasonable, adjustments are the exception rather than the rule. *Del. Valley*, 478 U.S. at 565, 106 S.Ct. 3088.

These two steps are separate and distinct. The appropriate factors to examine in each step, however, are not well-established. The Supreme Court has held that a court commits error by adjusting a particular award based on the "novelty [and] complexity of issues," the "special skill and experience of counsel," the "quality of representation," or the "results obtained." *Blum*, 465 U.S. at 898–900, 104 S.Ct. 1541; *accord Del. Valley*, 478 U.S. at 565, 106 S.Ct. 3088 (explaining that these factors presumably are reflected in the lodestar figure). Furthermore, a court errs by adjusting the lodestar to reflect customary fees charged in other cases; such customary fees are "not even a routine reason for market rates, but rather [are] a description of market rates." *Pierce v. Underwood*, 487 U.S. 552, 573, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). No general rule or formula governs the reasons for an adjustment. *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933.[2] The primary concern of a reviewing

---

1. Petitioner had also sought 0.70 hours for the work of a third attorney at the requested rate of $225.00. The special master found those 0.70 hours unnecessary and thus unreasonable. *Rupert*, 2002 WL 360005, at *5, 2002 U.S. Claims LEXIS 48, at *17. Petitioner does not cross-appeal that determination.

2. Customary reasons for adjustments are case specific, such as preclusion from other employment, desirability of the case, or existence of inflation or investment losses. *E.g., Copeland v. Marshall*, 641 F.2d 880, 890 (D.C.Cir.1980) (en banc). The most customary purpose of an adjustment, the accounting for risk, is not a consideration in litigation brought under statutes with

court in any fee award decision must be whether the lower court double-counted any particular factor by considering it both in the determination of the lodestar and in the making of an upward or downward adjustment. *E.g., Green v. Adm'rs of Tulane Educ. Fund,* 284 F.3d 642, 661 (5th Cir.2002); *Romberg v. Nichols,* 970 F.2d 512, 522 (9th Cir.1992).

■ Respondent predicates its request for review on the argument that, although the special master adopted the lodestar method, he failed to apply it properly. Specifically, respondent faults the special master for not making an appropriate determination of the reasonable rate for petitioner's attorneys' fees. A rate is normally reasonable when it is in line with the prevailing market rate, defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum,* 465 U.S. at 895–96 n. 11, 104 S.Ct. 1541. The award of a market-rate fee, rather than actual costs, is consistent with the Vaccine Act's statutory language and purpose. *Zeagler v. Sec'y of HHS,* 19 Cl.Ct. 151, 154 (1989) ("[S]ince congress did not place a cap on the amount of attorneys' fees that could be recovered the court must presume that the statute contemplates a market-based rate."); *see also Beck v. Sec'y of HHS,* 924 F.2d 1029, 1034–35 (Fed.Cir. 1991). As the Supreme Court explained in *Del. Valley,* 478 U.S. at 565–66, 106 S.Ct. 3088:

> A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a "reasonable" fee is wholly consistent with the rationale behind the usual fee-shifting statute, including the one in the present case. These statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking re-

dress for injuries resulting from the actual or threatened violation of specific federal laws. Hence, if plaintiffs, such as Delaware Valley, find it possible to engage a lawyer based on the statutory assurance that he will be paid a "reasonable fee," the purpose behind the fee-shifting statute has been satisfied.

> Moreover, when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance. In short, the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.

For these reasons the prevailing market rate is awarded regardless of the rate actually charged by the attorney. *Blum,* 465 U.S. at 895, 104 S.Ct. 1541 (awarding fees to nonprofit legal services agency on ground that it is "not legally relevant" that agency actually did not charge plaintiff); *Blanchard,* 489 U.S. at 93, 109 S.Ct. 939 ("Should a fee agreement provide less than a reasonable fee calculated [according to the lodestar method], the defendant should nevertheless be required to pay the higher amount."). An award of reasonable attorneys' fees, in other words, contemplates reasonable rather than actual compensation—"no more and no less." *Blanchard,* 489 U.S. at 93, 109 S.Ct. 939.

An applicant must provide objective evidence, beyond its attorneys' own affidavits, to show the prevailing market rate. *Blum,* 465

mandatory fee-shifting provisions, such as the Vaccine Act. *See Del. Valley,* 478 U.S. at 568, 106 S.Ct. 3088; *see also Stochastic Decisions, Inc. v. DiDomenico,* 995 F.2d 1158, 1168 (2d Cir.1993)

(many *Hensley* considerations have little applicability in context of mandatory fee-shifting statutes).

U.S. at 895–96 n. 11, 104 S.Ct. 1541; *accord Morris v. Sec'y of HHS,* 20 Cl.Ct. 14, 29 (1990). As discussed in *Morris,* an applicant has great latitude in meeting its burden of production:

> Proof of prevailing market rates for a lawyer's services may be demonstrated in a number of ways, including: (1) affidavits of other attorneys or experts; (2) citations to prior precedents showing reasonable rate adjudications for the fee applicant, for comparable attorneys, or for comparable cases; (3) references to fee award studies showing reasonable rates charged or awarded in the relevant community; (4) testimony of experts or of other attorneys in the relevant community; (5) discovery of rates charged by the opposing party; (6) reliance on [the] court's own expertise to recognize applicable prevailing rates.

20 Cl.Ct. at 28–29. Although the lodestar analysis affords ample room for discretion, it nevertheless requires that a court award rates that are compatible with the prevailing market rate. *Case v. Unified School Dist. No. 233,* 157 F.3d 1243, 1256 (10th Cir.1998) ("As long as the [court's] decision is grounded in appropriate market evidence, its ruling merits abuse-of-discretion deference from this court."); *Bordanaro v. McLeod,* 871 F.2d 1151, 1168–69 (1st Cir.1989) (district court abused its discretion by failing to find prevailing market rate).

Finding the prevailing market rate in practice has become more often art than science. As recognized by the Supreme Court, "[t]he type of services rendered by lawyers, as well as their experience, skill, and reputation, varies extensively." *Blum,* 465 U.S. at 895–96 n. 11, 104 S.Ct. 1541. In the typical lodestar analysis, the parties present a range of market rates for lawyers of differing skill levels, and the court interpolates the prevailing market rate by assessing and applying the skill demonstrated in the instant case to that range. *See Norman v. Hous. Auth. of the City of Montgomery,* 836 F.2d 1292, 1300 (11th Cir.1988).

The Supreme Court has not defined the parameters of a "relevant community," further complicating this analysis. As a general rule, the relevant community is the local community, defined as the forum in which the court sits or as the community where the attorney practices. *E.g., Reed v. Rhodes,* 179 F.3d 453, 470 (6th Cir.1999); *Everett Plywood Corp. v. United States,* 3 Cl.Ct. 705, 712–13 (1983). In certain circumstances the local community, by virtue of its size or the area of law, either contains no competitive market for such services or is one for which no data can be produced. *See Norman,* 836 F.2d at 1300; *Greene,* 19 Cl.Ct. at 66. Courts occasionally have opined as to the sufficiency of the comparison to rates charged in the local community when presented with large, federal, multiparty litigation, *see In Re "Agent Orange" Prod. Liability Litig.,* 818 F.2d 226, 231 (2d Cir.1987), or where reason exists to believe a sub-market for a legal specialty may exist, *see Covington v. Dist. of Columbia,* 57 F.3d 1101, 1113 (D.C.Cir.1995) (Hendersen, J., dissenting).

Nevertheless, the Supreme Court repeatedly has affirmed the prevailing market rate as the "centerpiece" of attorneys' fees and costs awards. *Blanchard,* 489 U.S. at 94, 109 S.Ct. 939. Difficulties, whether practical or theoretical, in applying the lodestar analysis do not excuse a court from its duty to award fees based on the prevailing market rate. *Cf. Nat'l Ass'n of Concerned Veterans v. Sec'y of Defense,* 675 F.2d 1319, 1325 (D.C.Cir.1982) ("The complexity of the market for legal services does not ... reduce the importance of fixing the prevailing hourly rate in each particular case with a fair degree of accuracy."). The fact that the comparison falls short of perfect exactitude does not make the fee award unreasonable. Indeed, "[t]he object in awarding a reasonable attorney's fee ... is to simulate the market where a direct market determination is infeasible." *Steinlauf v. Continental Ill. Corp.,* 962 F.2d 566, 572 (7th Cir.1992).

In cases where the parties cannot provide reliable evidence of the prevailing market, either because they are convinced that one does not exist or because the applicant has failed to meet his burden of proof, the court is not relieved of its burden to award fees based on a demonstrably reasonable rate. In such circumstances the court entertains other evidence to derive a reasonable rate.

*See Case,* 157 F.3d at 1257; *Morris,* 20 Cl.Ct. at 30. Such other evidence might even include the court's own experience with fees. *Saxton v. Sec'y HHS,* 3 F.3d 1517, 1521 (Fed.Cir.1993); *Case,* 157 F.3d at 1257. However, to remain within the bounds of discretion, the court first must determine that the prevailing market rate cannot be ascertained and that determination must be supported by the record. *Case,* 157 F.3d at 1255–57 (error for district court to ignore parties' market evidence and set hourly rate using rate it "consistently grant[s]").

■ According to respondent, the special master expressly avoided a determination of the prevailing market rate by announcing that "there is no such thing as a prevailing market rate" for Boston-area Vaccine Act attorneys. Resp.'s Br. filed Mar. 18, 2002, at 6–8. This characterization, however, somewhat misconstrues the language of the opinion, *Rupert,* 2002 WL 360005, at *4, 2002 U.S. Claims LEXIS 48, at *11–12, which quotes from *Blum:*

> [T]he process of fixing an appropriate hourly rate is "inherently difficult." First, "there is no such thing as a prevailing market rate for" lawyers' time in any "particular community" because of wide variations in "the hourly rates of lawyers in private practice" reflecting differences in lawyers' services, abilities and status. Second, Program practice attracts a diverse, national bar, blurring possibly the concept of a distinct, "relevant community."

Contrary to respondent's argument, the special master subsequently undertook the lodestar analysis. After calculating the reasonable number of hours, and articulating reasons for discounting several of those hours, *id.* at *3–4, 2002 U.S. Claims LEXIS 48, at *15–19, the special master sought to determine the prevailing market rate. Finding the majority of the evidence presented by both parties unpersuasive, the special master settled on the affidavit of Stephen I. Lipman, Esq., an attorney practicing in Boston, Massachusetts, the same locale as petitioner's attorneys. *Id.* at *8,

2002 U.S. Claims LEXIS 48, at *27. Mr. Lipman attested that he charged $365.00 per hour, plus a 6% general and administrative fee for his services. *Id.* at *6, 2002 U.S. Claims LEXIS 48, at *22. In a previous affidavit, Mr. Lipman had explained that he was a personal injury lawyer practicing since 1967. The special master indicated that he "may accept Mr. Lipman's affidavit as a direct, reliable indication of the prevailing market rate in Boston, Massachusetts, for a personal injury lawyer with over thirty years experience." *Id.* at *8, 2002 U.S. Claims LEXIS 48, at *27. After concluding that petitioner's requested rates were therefore at least "not *per se* unreasonable," he stated that the rate nevertheless was "not inherently reasonable for Program cases." *Id.* The special master proceeded to analyze petitioner's requested rates against other published awards and his own experiences with the Vaccine Act, finding the hourly rates "clearly at the upper end of the range of rates that special masters have approved since the Program's inception. Indeed, the special master has awarded previously much lower hourly rates to Mr. Homer and to Mr. Conway." *Id.* at *10, 2002 U.S. Claims LEXIS 48, at *33. Because of their demonstrated expertise in Vaccine Act cases and the fact that Boston is an "undeniably expensive metropolitan area," however, the special master ultimately found that the requested rates were reasonable. *Id.* at *10, 2002 U.S. Claims LEXIS 48, *35–36.

The basis for the special master's award of attorneys' fees is ambiguous. His adoption of Mr. Lipman's affidavit, followed by the finding that petitioner's requested rates therefore were "not *per se* unreasonable," but nevertheless not "inherently reasonable for Program cases," does not correlate to an express finding of a prevailing market rate. It is a plausible reading of the opinion that the special master correctly followed the lodestar analysis, deeming the Mr. Lipman's affidavit as evidence of the prevailing market rate and deeming petitioner's lower requested rate reasonable in light of the complexity and skill required for petitioner's case.[3] It is

---

**3.** Although the Court of Federal Claims reviews the judgment of the special master, not his opinion, *cf. Consol. Aluminum Corp. v. Foseco Int'l Ltd.,* 910 F.2d 804, 814 (Fed.Cir.1990) ("An ap-

equally plausible that the special master made no express finding of the prevailing market rate, instead proceeding to utilize factors to develop a reasonable rate. Such ambiguity is itself sufficient to warrant a remand because the awarding court must articulate its reasons for the award or denial of fees. *See Hensley,* 461 U.S. at 437, 103 S.Ct. 1933 (requiring district court to provide "a concise but clear explanation of its reasons for the fee award"); *Kerin v. USPS,* 218 F.3d 185, 193 n. 5 (2d Cir.2000) ("[A]ppellate review of an award of attorneys' fees must 'be informed by the record of why the district court acted as it did,' such that remand is appropriate where 'the district court did not make adequate findings to permit appropriate appellate review.' "); *Cunningham v. County of Los Angeles,* 879 F.2d 481, 487 (9th Cir.1988) (court must state "which factors it is relying on and explain[ ] its reasoning.").

Much of the ambiguity in the special master's opinion manifestly is attributable to his attempt to follow the guidance of the Chief Special Master articulated in *Erickson v.*

---

pellate court need not close its eyes to the record where ... there is a way clearly open to affirm the [lower] court's action."), the deficiencies in Mr. Lipman's affidavit, as discussed in the next section, preclude this court from affirming on this ground.

4. It appears from this survey, however, that these three courts nevertheless awarded fees based on the traditional geographic approach.

5. The Chief Special Master stated that the national-market approach had been sanctioned by the Federal Circuit in *Saxton.* That case, however, dealt only with the special master's determination of the reasonableness of hours expended by an attorney, and the opinion is silent as to the issue of determining the relevant community for purposes of establishing a reasonable rate.

In explaining that a special master has the discretion to apply his personal experience with a particular attorney as a factor in the reasonableness of hours, the Federal Circuit did refer repeatedly to the Vaccine Act's grant of discretion to the court in determining "reasonableness." *Saxton,* 3 F.3d at 1521–22. *Saxton* fairly can be read as approving the use of the special master's broad discretion—and personal experience—in determining whether the reasonable rate to be an awarded in a particular case is the prevailing market rate, or whether other factors, such as the individual attorney's experience or

---

*Sec'y of HHS,* No. 96–361V, 1999 WL 1268149, 1999 U.S. Claims LEXIS 292 (Fed. Cl.Spec.Mstr. Dec. 10, 1999). In fact, respondent's brief is a reexamination of the merits of that decision. The Vaccine Act petitioner in *Erickson* sought compensation for an attorney practicing in Twin Falls, Idaho. Petitioner submitted, *inter alia,* affidavits from other practitioners in Twin Falls attesting that the requested rate was reasonable for the area. Respondent objected, *inter alia,* on the ground that the requested rate was not in line with those awarded to other Vaccine Act attorneys.

Before addressing the rate to be awarded, *Erickson* noted that at least three federal courts have discussed the possibility that in certain circumstances the "relevant community" for purposes of the lodestar analysis properly may be defined by a national pool of attorneys engaged in a certain type of practice, rather than by the traditional locality rule.[4] *Erickson* then observed that Vaccine Act special masters have awarded attorneys' fees both under the locality rule and as a national market.[5] According to the opinion,

---

the complexity of the litigation, warrant upward or downward adjustment. This is fully consistent with the contours for the exercise of discretion laid out by the Supreme Court. *See Hensley,* 461 U.S. at 433–34, 103 S.Ct. 1933. The Federal Circuit, however, did not opine further on a special master's discretion in the area of the prevailing market rate. Indeed, both of the cases *Saxton* cites for the proposition that "[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorney fee requests," 3 F.3d at 1521, expressly had made findings of the prevailing market rate. In *Bernardi v. Yeutter,* 951 F.2d 971, 974 (9th Cir.1991), the Ninth Circuit, addressing the district court's application of an adjustment to the prevailing market rate, determined that the lower court did not err when it refused to award other than the prevailing market rate on the ground that the case before it was not "complex." Similarly, in *Coulter v. State of Tenn.,* 805 F.2d 146, 148 (6th Cir.1986), the Sixth Circuit held that the district court did not err when it lowered the requested rate for one particular year of litigation; although petitioner's attorney had charged a higher rate to the client, the district court properly determined that the lower rate was the prevailing community rate for that year. In other words, nothing in *Saxton,* or in the cases it cites, sanctions the practice of awarding fees based on a national, rather than a local, market.

the latter was the more "objective and intellectually comforting" approach. *Id.* at *5, 1999 U.S. Claims LEXIS 292, at *21.[6] *Erickson* posited that the proper lodestar analysis for a Vaccine Act claim would be as follows: first, to consider the prevailing market rate in the city or locale where the attorney practices; second, as a "confirmatory measure," to consider the market rate for attorneys practicing Program-wide and in other complex federal litigation, where that information is available. *Id.* at *5, 1999 U.S. Claims LEXIS 292, at *23. The opinion does not further explain how the "confirmatory measure" comports with the discretion afforded a judge under the lodestar analysis.

Customarily, special masters have awarded attorneys' fees on the low end of the prevailing geographic rate, reasoning that litigation under the Vaccine Act does not compare to the kind of "skill, experience, and reputation" required of those attorneys who can command the highest market rates. *See Morris,* 20 Cl.Ct. at 30; *Zeagler,* 19 Cl.Ct. at 153–54.[7] In these cases evidence of awards to other Vaccine Act attorneys is used as a proxy to account for the "skill, experience, and reputation" of a typical Vaccine Act attorney in order to justify the award of fees at the low end of the local market rate, *e.g., Morris,* 20 Cl.Ct. at 30 n. 13, or as evidence of the likely prevailing market rate in cases where the petitioner failed to provide satisfactory evidence of the local market rate, *e.g., Edgar,* 1994 WL 256609, at *3, 1994 U.S. Claims LEXIS 108, at *8; *Maloney,* 1992 WL 167257, at *7, 1992 U.S. Claims LEXIS 324, at *11–14.

To the extent that *Erickson* merely expresses the view that a special master should review all of the available evidence before him, the opinion is consistent with the special master's grant of discretion. Furthermore, to the extent that *Erickson* provides guidance as to the finding of a reasonable rate in the absence of evidence of the prevailing market rate, the opinion is consistent with the discretion afforded the trier of fact under the lodestar analysis. Ultimately, as is apparent from the instant case, *Erickson* is ambiguous. It is unclear whether the national "confirmatory measure" constitutes a factor by which to place a Vaccine Act attorney within the range of an established local market rate, whether it is itself offered as factor of the prevailing market rate, or whether it is offered as the basis for an adjustment.

■ This ambiguity encourages a special master to commit legal error. For example, *Erickson* itself found that "based upon locality data, the evidence provides satisfactory support that the rate requested is in line with those prevailing in the Twin Falls community for similar services by lawyers of reasonably comparable skill, experience, and reputation," which was defined as attorneys "handling medical malpractice, products liability or personal injury claims." 1999 WL 1268149, at *6, 1999 U.S. Claims LEXIS 292, at **23, 25 n. 11. It then found the rate requested "in line with those prevailing in the Vaccine Program." *Id.* at *7, 1999 U.S. Claims LEXIS 292, at *32. For purposes of the lodestar, a judge cannot make a finding of two prevailing market rates, one from the pool of medical malpractice, products liability, and personal injury attorneys in Twin

---

**6.** Notably, the only two cases cited for the proposition that Vaccine Act special masters have adopted a national market were decided by the Chief Special Master himself, and neither of these cases awarded fees based upon a finding that the relevant community for the determination of a prevailing market rate is a national one. *See Edgar v. Sec'y of HHS,* No. 90–711V, 1994 WL 256609, at *3, 1994 U.S. Claims LEXIS 108, at *8 (Fed.Cl.Spec.Mstr. May 27, 1994) (in absence of relevant objective information from which to determine a reasonable rate, special master used his subjective experience to compare petitioner's attorney "with other attorneys in this Program of similar quality and experience who practice in similar geographic areas"); *Maloney v. Sec'y of HHS,* No. 90–1034V, 1992 WL

167257, at *7, 1992 U.S. Claims LEXIS 324, at *21–23 (Fed.Cl.Spec.Mstr. June 30, 1992) (placing awards on lower end of prevailing market rate for Suffolk County and Boston, Massachusetts).

**7.** *Erickson* expressly disagreed with the proposition that Vaccine Act litigation is not comparable to complex litigation. 1999 WL 1268149, at *4, 1999 U.S. Claims LEXIS 292, at *19–20. Because this conclusion goes to the factual determinations of the complexity of litigation as a factor in the lodestar, and not to the legal application of the lodestar test itself, the court expresses no opinion on *Erickson's* conclusion in this area.

Falls, and one from a separate national pool of Vaccine Act attorneys. The legal error is evident if one considers what a special master would be forced to do if he found that the national rate did not correlate with the local market rate. Having explicitly found that a petitioner's proffered evidence established the prevailing market rate to be awarded, the special master would be required to adjust that prevailing market rate so as to put it in line with the national range for Vaccine Act attorneys. Such an adjustment would be error. The prevailing market rate cannot be adjusted based on the complexity of or aspects inherent to the type of litigation itself. *See Blum,* 465 U.S. at 898–900, 104 S.Ct. 1541.

The court suspects that *Erickson's* offer of a compromise methodology is an attempt to create a prevailing market rate unique to Vaccine Act litigation. Implicit in this offer, and explicit in petitioner's argument on review, is the assumption that a Vaccine Act attorney is *sui generis,* such that a Vaccine Act attorney can never withstand a genuine comparison to an attorney with another type of practice. Although litigation under the Vaccine Act may have unique aspects, Vaccine Act awards traditionally have been held comparable to that of medical malpractice work. While the Chief Special Master elaborated as to why he believed Vaccine Act litigation instead comparable to "other complex federal litigation," *Erickson* offers no specific circumstances to support the inference that the traditional locality comparison is inadequate. Of equal importance, the mere fact that in any given geographic area only a few attorneys actively pursue Vaccine Act litigation does not justify an assumption that claimants shop nationally for such representation.[8]

### 2. *Abuse of discretion in fee awards*

■ Respondent also appeals on the ground that certain of the special master's factual findings were arbitrary and capricious or otherwise contrary to law. As discussed above, whether the special master's findings were arbitrary and capricious depends on whether the special master found it possible to establish a prevailing market rate for petitioner's attorneys. If such market rate could not be determined, it would not have been arbitrary or capricious for the special master to have created a reasonable rate based on the findings of other courts, *see Spegon v. Catholic Bishop,* 175 F.3d 544, 557 (7th Cir. 1999); *Morris,* 20 Cl.Ct. at 28–29, or, in the absence of objective evidence, on his personal knowledge of petitioner's attorneys' customary billing rates, *Case,* 157 F.3d at 1257; *Saxton,* 3 F.3d at 1522; *cf. Davis v. Sec'y of HHS,* 19 Cl.Ct. 395, 403 (1990).

It is appropriate for a court to use the affidavit of a third-party attorney as evidence of the prevailing market rate. *Blum,* 465 U.S. at 895–96 n. 11, 104 S.Ct. 1541; *Norman,* 836 F.2d at 1299 ("Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence."). However, the affidavit must provide "[a]dequate proof from individuals familiar with the market of the community billing rate charged by attorneys of equivalent skill and experience performing services of similar complexity." *Raney v. Fed. Bureau of Prisons,* 222 F.3d 927, 938 (Fed.Cir.2000); *accord Greene,* 19 Cl.Ct. at 66.

Augmenting her petition, petitioner submitted, *inter alia,* three affidavits from attorneys practicing in Boston, Massachusetts. Two merely attested broadly that the rates requested by plaintiff were "reasonable and proper." *Rupert,* 2002 WL 360005, at *6, 2002 U.S. Claims LEXIS 48, at *22. The special master nevertheless concluded that these affidavits provided "basic support regarding the reasonableness" of petitioner's attorneys' fees. *Id.* at *8, 2002 U.S. Claims LEXIS 48, at *26–27. The third, Mr. Lipman's affidavit, included information leading the special master to find that it constituted evidence "of the prevailing market rate in Boston, Massachusetts, for a personal injury lawyer with over thirty years experience." *Id.* at *8, 2002 U.S. Claims LEXIS 48, at *27.

---

**8.** Indeed, *Erickson's* finding that Vaccine Act attorneys have been compensated from between $55.00 to $250.00 per hour would seem to negate the inference that there exists a national competitive market for such attorneys.

Moreover, the special master concluded that, "[b]ased solely upon Mr. Lipman's affidavit, [petitioner's requested rates] are not *per se* unreasonable." *Id.* The special master expressly rejected all other evidence submitted by both petitioner and respondent.

Respondent challenges the special master's reliance on these affidavits, charging that they are the kind of "generalized and conclusory information and belief affidavits from friendly attorneys" routinely rejected by the courts. As articulated by the D.C. Circuit in *Concerned Veterans*, 675 F.2d at 1325–26:

> [G]eneralized and conclusory "information and belief" affidavits from friendly attorneys presenting a wide range of hourly rates will not suffice. To be useful an affidavit stating an attorney's opinion as to the market rate should be as specific as possible.... The best evidence would be the hourly rate customarily charged by the affiant himself or by his law firm. Alternatively, the affidavit might state that the stated rate is based on the affiant's personal knowledge about specific rates charged by other lawyers or rates for similar litigation.
>
> ....
>
> ... The District Court's task is to determine the approximate market rate. Its inquiry is aided little by an affidavit which just offers one attorney's conclusory and general opinion on what that rate is. Nor is it helpful if the affiant simply states that he is familiar with the attorney and the litigation and that he thinks the fee request is reasonable. What is needed are some pieces of evidence that will enable the District Court to make a reasonable determination of the appropriate hourly rate.

Although, of the three, Mr. Lipman's affidavit comes closest to meeting this standard, standing alone it does not provide sufficient detail so as to support a finding that $365.00 an hour is the prevailing market rate for comparable attorneys. *See Greene*, 19 Cl.Ct. at 66; *Bell v. Sec'y of HHS*, 18 Cl.Ct. 751, 761 (1989). More troubling, the special master appears to have adopted Mr. Lipman's affidavit as the prevailing market rate (to the extent that it may be concluded that he found

a prevailing market rate) because respondent did not respond to an order in which the special master questioned the probative value of the affidavit and "invited respondent to obtain 'rebuttal affidavits from personal injury attorneys in Boston, Massachusetts, whom respondent has interviewed' regarding Mr. Lipman's statements," so as to "fill[ ] the hole in plaintiff's proof." *Rupert*, 2002 WL 360005, at *8, 2002 U.S. Claims LEXIS 48, at *27 n. 6 (italics in original) (citing *Guckenberger v. Boston Univ.*, 8 F.Supp.2d 91, 103 (D.Mass.1998)). Respondent has no duty to fill the holes in the Mr. Lipman's affidavit. *See Blum*, 465 U.S. at 895–96 n. 11, 104 S.Ct. 1541.

In the circumstances of this case, the special master properly adopted Mr. Lipman's affidavit as one piece of evidence of the range of prevailing market rates in Boston, Massachusetts. He must explain, however, how the weaknesses in the affidavit are compensated for or offset by other objective evidence. If no other proffered evidence is probative, then the special master shall make an express finding that the prevailing market rate could not be determined from this evidence before turning to other proof, such as personal experience. *See Case*, 157 F.3d at 1256; *Bordanaro*, 871 F.2d at 1168–69.

■ Similarly, the special master abused his discretion in awarding a $75.00 rate for petitioner's paralegals. Petitioner had requested compensation at a rate of $85.00. The special master found that petitioner had failed to establish that $85.00 represented the prevailing market rate for paralegals in Boston, Massachusetts. Having expressly determined that petitioner had failed to establish a prevailing market rate, the special master found that no Vaccine Act decision had awarded an $85.00 rate. He then awarded a rate of $75.00 as a reasonable rate for a paralegal in petitioner's high-caliber law firm, noting that another special master had found $60.00 to be reasonable for a paralegal at an average law firm. *Rupert*, 2002 WL 360005, at *11, 2002 U.S. Claims LEXIS 48, at *37. However, that decision held only that the $60.00 rate was reasonable for a paralegal in Los Angeles, California. *Corder v. Sec'y of HHS*, No. 97–125V, 1999 WL

1427753, at *6, 1999 U.S. Claims LEXIS 298, at *21 (Fed.Cl.Spec.Mstr. Dec. 22, 1999). Missing from the special master's analysis is the explanation that, in his opinion, the average rate for a paralegal in Los Angeles, California, is comparable to the average in Boston, Massachusetts.[9] Without such an explanation, the special master's award appears to be based on a perceived national market rate for paralegals, and the record does not reveal a basis for the award of paralegal fees based on a national rate.

## CONCLUSION

The court remands the case to the special master to make an explicit finding of the prevailing market rate for a Vaccine Act or comparable attorney practicing in Boston, Massachusetts, as well as for a paralegal in that area. If he determines that no such rate exists, then, he shall so state and then, within the bounds of his discretion, proceed to develop a reasonable rate. Accordingly,

**IT IS ORDERED,** as follows:

Pursuant to 42 U.S.C. § 300aa–12(e)(2)(c), this case is remanded to the Special Master consistent with the foregoing.

---

**9.** Here, again, the parties on appeal do not make any specific arguments attacking or defending the $75.00 rate, and this court is not in a position to uphold or deny that rate on other possible grounds.